UNITED STATES *v.* GENERAL MOTORS
CORP. ET AL.

No. 46.  Argued December 9, 1965.—Decided April 28, 1966.

128

*Daniel M. Friedman* argued the cause for the United States. On the brief were *Solicitor General Marshall, Assistant Attorney General Turner, Lionel Kestenbaum, Richard A. Posner* and *Robert C. Weinbaum.*

*Homer I. Mitchell* argued the cause for appellee General Motors Corp. With him on the brief were *Warren*

M. Christopher, Marcus Mattson, Aloysius F. Power, Robert A. Nitschke, Nicholas J. Rosiello, Henry C. Thumann, Donald M. Wessling and Robert W. Culver. Victor R. Hansen argued the cause for appellees Losor Chevrolet Dealers Association et al. With him on the brief were Glenn S. Roberts and Henry F. Walker.

Thomas A. Rothwell and William C. Hillman filed a brief for O. M. Scott & Sons Co. et al., as amici curiae.

MR. JUSTICE FORTAS delivered the opinion of the Court.

This is a civil action brought by the United States to enjoin the appellees from participating in an alleged conspiracy to restrain trade in violation of § 1 of the Sherman Act.[1] The United States District Court for the Southern District of California concluded that the proof failed to establish the alleged violation, and entered judgment for the defendants. The case is here on direct appeal under § 2 of the Expediting Act, 32 Stat. 823, 15 U. S. C. § 29 (1964 ed.). We reverse.

## I.

The appellees are the General Motors Corporation, which manufactures, among other things, the Chevrolet line of cars and trucks, and three associations of Chevrolet dealers in and around Los Angeles, California.[2] All of the Chevrolet dealers in the area belong to one or more of the appellee associations.

---

[1] The statute reads in relevant part: "Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal. . . ." 26 Stat. 209, 15 U. S. C. § 1 (1964 ed.).

[2] Named as co-conspirators but not as defendants are "[t]he officers, directors, and members of [the three associations], certain officers and employees of such members, certain officers and employees of General Motors, other Chevrolet dealers in the Southern California area, and others to the plaintiff unknown . . . ."

130

Chevrolets are ordinarily distributed by dealers operating under a franchise from General Motors. The dealers purchase the cars from the manufacturer, and then retail them to the public. The relationship between manufacturer and dealer is incorporated in a comprehensive uniform Dealer Selling Agreement. This agreement does not restrict or define those to whom the dealer may sell. Nor are there limitations as to the territory within which the dealer may sell. Compare *White Motor Co.* v. *United States,* 372 U. S. 253. The franchise agreement does, however, contain a clause (hereinafter referred to as the "location clause") which prohibits a dealer from moving to or establishing "a new or different location, branch sales office, branch service station, or place of business including any used car lot or location without the prior written approval of Chevrolet."

Beginning in the late 1950's, "discount houses" engaged in retailing consumer goods in the Los Angeles area and "referral services" [3] began offering to sell new cars to the public at allegedly bargain prices. Their sources of supply were the franchised dealers. By 1960 a number of individual Chevrolet dealers, without authorization from General Motors, had developed working relationships with these establishments. A customer would enter one of these establishments and examine the literature and price lists for automobiles produced by several manufacturers. In some instances, floor models were available for inspection. Some of the establishments negotiated

---

[3] Since the evidence does not consistently distinguish between "discount houses" and "referral services," based either on the variety of goods offered to the public or on the nature of the arrangement between the establishment and the franchised dealer which supplied it with cars, we shall hereinafter use the term "discounter" to embrace all such establishments.

with the customer for a trade-in of his old car, and provided financing for his new-car purchase.

The relationship with the franchised dealer took various forms. One arrangement was for the discounter to refer the customer to the dealer. The car would then be offered to him by the dealer at a price previously agreed upon between the dealer and the discounter. In 1960, a typical referral agreement concerning Chevrolets provided that the price to the customer was not to exceed $250 over the dealer's invoiced cost. For its part in supplying the customer, the discounter received $50 per sale.

Another common arrangement was for the discounter itself to negotiate the sale, the dealer's role being to furnish the car and to transfer title to the customer at the direction of the discounter. One dealer furnished Chevrolets under such an arrangement, charging the discounter $85 over its invoiced cost, with the discounter getting the best price it could from its customer.

These were the principal forms of trading involved in this case, although within each there were variations,[4] and there were schemes which fit neither pattern.[5]

---

[4] One dealer, for example, paid its referral service one-third of the gross profit on each sale, up to $75, there being no fixed price at which the sale was to take place. The same dealer earlier had paid a flat fee of $17.50 for every referral, whether or not the sale was consummated.

[5] At least one discount house actually purchased its cars from cooperative dealers, then resold them to its customers. In this situation, which in the trade is referred to as "bootlegging," the customer does not receive a new-car warranty. General Motors, while disapproving of the practice, does not assert that it violates the "location clause." In those arrangements against which General Motors and the associations did direct their efforts, title to the new car passed directly from dealer to retail customer, who thus obtained a new-car warranty and service agreement.

There must also be distinguished the ubiquitous practice of using "bird dogs"—informal sources who steer occasional customers toward a particular dealer, in return for relatively small fees—often a bottle

By 1960 these methods for retailing new cars had reached considerable dimensions. Of the 100,000 new Chevrolets sold in the Los Angeles area in that year, some 2,000 represented discount house or referral sales. One Chevrolet dealer attributed as much as 25% of its annual sales to participation in these arrangements, while another accounted for between 400 and 525 referral sales in a single year.

Approximately a dozen of the 85 Chevrolet dealers in the Los Angeles area were furnishing cars to discounters in 1960. As the volume of these sales grew, the nonparticipating Chevrolet dealers located near one or more of the discount outlets [6] began to feel the pinch. Dealers lost sales because potential customers received, or thought they would receive,[7] a more attractive deal from a dis-

of liquor. This practice is not only deemed by General Motors not to violate the "location clause," but has the corporation's endorsement as a desirable sales device.

[6] As the District Court found, 70% of the local Chevrolet dealers were located within five miles of one or more of the 23 discount house or referral outlets.

[7] There is evidence in the record that discount sales undercut the prices at which franchised dealers were able to, or chose to, compete. Two purchasers of Chevrolets, one on referral and the other in a discount house "sale," testified that they had "shopped" other dealers but found the discount and referral prices lower. Dealers and their salesmen complained to General Motors about sales lost through inability to meet the discounters' price. Moreover, the discounters advertised and actually provided auto loans at interest rates substantially lower than those offered by G. M. A. C., General Motors' financing subsidiary.

There is also evidence that it was not just price itself which induced customers to purchase Chevrolets through the discounters. One customer testified that he preferred the discount house because he thereby avoided the haggling over price which seems an inevitable facet of purchasing a car in the orthodox way. Others apparently assumed, without bothering to confirm by comparison shopping, that "discount" stores would offer lower prices. This assumption was fed

counter who obtained its Chevrolets from a distant dealer. The discounters vigorously advertised Chevrolets for sale, with alluring statements as to price savings. The discounters also advertised that all Chevrolet dealers were obligated to honor the new-car warranty and to provide the free services contemplated therein; and General Motors does indeed require Chevrolet dealers to service Chevrolet cars, wherever purchased, pursuant to the new-car warranty and service agreement. Accordingly, nonparticipating dealers were increasingly called upon to service, without compensation, Chevrolets purchased through discounters. Perhaps what grated most was the demand that they "precondition" cars so purchased—make the hopefully minor adjustments and do the body and paint work necessary to render a factory-fresh car both customer- and road-worthy.

On June 28, 1960, at a regular meeting of the appellee Losor Chevrolet Dealers Association, member dealers discussed the problem and resolved to bring it to the attention of the Chevrolet Division's Los Angeles zone manager, Robert O'Connor. Shortly thereafter, a delegation from the association called upon O'Connor, presented evidence that some dealers were doing business with the discounters, and asked for his assistance. O'Connor promised he would speak to the offending dealers. When no help was forthcoming, Owen Keown, a director of Losor, took matters into his own hands. First, he spoke to Warren Biggs and Wilbur Newman, Chevrolet dealers who were then doing a substantial business with discounters. According to Keown's testimony, Newman told him that he would continue the practice "until . . . told not to by" Chevrolet, and that "when the Chevrolet Motor Division told him not to do it, he

by discount house advertising which promised "the lowest price anywhere" and "savings of hundreds of dollars."

knew that they wouldn't let some other dealer carry on with it." [8]

Keown then reported the foregoing events at the association's annual meeting in Honolulu on November 10, 1960. The member dealers present agreed immediately to flood General Motors and the Chevrolet Division with letters and telegrams asking for help. Salesmen, too, were to write.[9]

Hundreds of letters and wires descended upon Detroit—with telling effect. Within a week Chevrolet's O'Connor was directed to furnish his superiors in Detroit with "a detailed report of the discount house operations . . . as well as what action we in the Zone are taking to curb such sales." [10]

By mid-December General Motors had formulated its response. On December 15, James M. Roche, then an executive vice president of General Motors, wrote to some of the complaining dealers. He noted that the

---

[8] Dealer Biggs put the same sentiments into a letter to both Keown and Chevrolet's zone manager O'Connor, written on November 5, 1960. The day before, in O'Connor's presence, Keown had challenged Biggs to justify his dealings with the discounters. Biggs wrote: "We would be most reluctant to discard an account as good as this one without rather concrete assurance that it would not immediately be picked up by another Chevrolet dealer." Two weeks later, O'Connor forwarded Biggs' letter to General Motors officials in Detroit.

[9] In Keown's words, "We were seeking the assistance of the higher echelon officials of Chevrolet and General Motors in bringing about an end to the discount house sale of Chevrolets."

[10] O'Connor's report, dated November 22, recounted that "zone management" had talked with the offending dealers "in an attempt to have them desist," and that "[o]ur Dealer Associations have formed a committee to call on the supplying dealers and have asked them and have attempted to persuade them to discontinue this practice." Supported by a copy of dealer Biggs' letter, see n. 8, *supra*, O'Connor predicted that "many dealers will cease this type of business if they had any assurance that the account would not be picked up by some other dealer, immediately upon relinquishment."

practices to which they were objecting *"in some instances* represent the establishment of a second and unauthorized sales outlet or location contrary to the provisions of the General Motors Dealers Selling Agreements." (Emphasis supplied.) Recipients of the letter were advised that General Motors personnel proposed to discuss that matter with each of the dealers.[11] O'Connor in Los Angeles was apprised of the letter's content and instructed to carry on the personal discussions referred to therein. With respect to the offending dealers, he was to work with Roy Cash, regional manager for the Chevrolet Division. Cash had been briefed on the subject in Detroit on December 14.

General Motors personnel proceeded to telephone all area dealers, both to identify those associated with the discounters and to advise nonparticipants that General Motors had entered the lists. The principal offenders were treated to unprecedented individual confrontations with Cash, the regional manager. These brief meetings were wholly successful in obtaining from each dealer his agreement to abandon the practices in question. Some capitulated during the course of the four- or five-minute meeting, or immediately thereafter.[12] One dealer, who met not with Cash but with the city sales manager for

---

[11] Roche wrote to those dealers who had complained directly to John Gordon, then president of General Motors. On December 29, 1960, a virtually identical letter went out to all General Motors dealers throughout the Nation, under the signature of the general sales managers for the respective divisions.

[12] One dealer testified that he abruptly terminated arrangements long maintained with two discount houses, despite the fact that one of these connections owed him $20,000 and the other $28,000. In the preceding four weeks the latter had reduced its indebtedness by $52,000 and could reasonably have been expected to erase it completely within a few weeks. The dealer anticipated that upon cancellation of the accounts these debts would become uncollectible. His fears were justified. The accounts were terminated. The debts remained unpaid.

Chevrolet, put off decision for a week "to make sure that the other dealers, or most of them, had stopped their business dealings with discount houses." [13]

There is evidence that unanimity was not obtained without reference to the ultimate power of General Motors. The testimony of dealer Wilbur Newman was that regional manager Cash related a story, the relevance of which was not lost upon him, that in handling children, "I can tell them to stop something. If they don't do it . . . I can knock their teeth down their throats."

By mid-January General Motors had elicited from each dealer a promise not to do business with the discounters. But such agreements would require policing— a fact which had been anticipated. General Motors earlier had initiated contacts with firms capable of performing such a function. This plan, unilaterally to police the agreements, was displaced, however, in favor of a joint effort between General Motors, the three appellee associations, and a number of individual dealers.

On December 15, 1960, representatives of the three appellee associations had met and appointed a joint committee to study the situation and to keep in touch with

---

[13] According to Francis Bruder, a dealer who had been doing business with the discounters since 1957, "Cash told me that he felt certain that the other dealers would discontinue dealing with discount houses and referral services as well. I left this meeting with the impression that every dealer who had been doing business with a discount house or referral service would soon quit."

This was precisely the impression General Motors had intended to implant. As was explained in an inter-office memorandum to the general sales manager of General Motors' Chevrolet Division, "[All dealers were talked to] in order that every dealer with whom the subject was discussed would know that a similar discussion was being held with all other dealers so that, if certain dealers should elect to discontinue their cooperation with a discount house, we might be able to discourage some other dealer who might be solicited from starting the practice."

Chevrolet's O'Connor.[14]  Early in 1961, the three associations agreed jointly to finance the "shopping" of the discounters to assure that no Chevrolet dealer continued to supply them with cars.  Each of the associations contributed $5,000, and a professional investigator was hired. He was instructed to try to purchase new Chevrolets from the proscribed outlets, to tape-record the transactions, if any, and to gather all the necessary documentary evidence—which the associations would then lay "at the doorstep of Chevrolet."  These joint associational activities were both preceded and supplemented by similar "shopping" activities by individual dealers and by appellee Losor Chevrolet Dealers Association.

General Motors collaborated with these policing activities.  There is evidence that zone manager O'Connor and a subordinate, Jere Faust, actively solicited the help of individual dealers in uncovering violations.  Armed with information of such violations obtained from the dealers or their associations, O'Connor or members of his staff would ask the offending dealer to come in and talk. The dealer then was confronted with the car purchased by the "shopper," the documents of sale, and in most cases a tape recording of the transaction.  In every instance, the embarrassed dealer repurchased the car, sometimes at a substantial loss, and promised to stop such sales.  At the direction of O'Connor or a subordinate, the checks with which the cars were repurchased were

---

[14] The District Court characterized this December 15 meeting as the first between representatives of the three associations, pertaining to the problem of discount house and referral sales.  However, as we have previously noted, n. 10, *supra,* O'Connor reported to General Motors three weeks earlier, on November 22, that the three associations had formed a committee which already had called upon nonconforming dealers.  The record does not enable us to resolve this factual conflict, nor is its resolution important.  On either version, the appellee associations entered into an explicit agreement to act together to eliminate the new mode of intrabrand competition.

made payable to an attorney acting jointly for the three defendant associations.

O'Connor testified that on no occasion did he "force" a dealer to repurchase; he merely made the opportunity available. But one dealer testified that when an assistant zone manager for the Chevrolet Division asked him to come in and talk about discount sales, "he specified a sum of money which I was to bring with me when I came down and saw him. . . . I kept the appointment and brought a cashier's check. I knew when I came down to Los Angeles that I was going to repurchase an automobile . . . ." Another dealer testified that upon being confronted with evidence that one of his cars had been purchased through a referral service, he not only bought it back (without questioning the correctness of the price exacted) but also fired the employee responsible for the transaction—although the employee had been commended by the Chevrolet Division a few weeks earlier as the "number one fleet salesman" in the 11-state Pacific region.

By the spring of 1961, the campaign to eliminate the discounters from commerce in new Chevrolet cars was a success. Sales through the discount outlets seem to have come to a halt. Not until a federal grand jury commenced an inquiry into the matters which we have sketched does it appear that any Chevrolet dealer resumed its business association with the discounters.

## II.

On these basic facts, the Government first proceeded criminally. A federal grand jury in the Southern District of California returned an indictment. After trial, the defendants were found not guilty. The present civil action, filed shortly after return of the indictment, was then brought to trial.

Both the Government and the appellees urge the importance, for purposes of decision, of the "location clause" in the Dealer Selling Agreement which prohibits a franchised dealer from moving to or establishing "a new or different location, branch sales office, branch service station, or place of business . . . without the prior written approval of Chevrolet." The appellees contend that this contractual provision is lawful, and that it justifies their actions. They argue that General Motors acted lawfully to prevent its dealers from violating the "location clause," that the described arrangements with discounters constitute the establishment of additional sales outlets in violation of the clause, and that the individual dealers—and their associations—have an interest in uniform compliance with the franchise agreement, which interest they lawfully sought to vindicate.

The Government invites us to join in the assumption, only for purposes of this case, that the "location clause" encompasses sales by dealers through the medium of discounters. But it urges us to hold that, so construed, the provision is unlawful as an unreasonable restraint of trade in violation of the Sherman Act.[15]

We need not reach these questions concerning the meaning, effect, or validity of the "location clause" or of any other provision in the Dealer Selling Agreement, and we do not. We do not decide whether the "location

---

[15] The Government's complaint contains no reference to the "location clause," and the Government concedes that its case was tried on a conspiracy theory, the defendants injecting the contractual issue by way of defense. Trial counsel for the Government did advert to the clause in the District Court, but it does not appear that he challenged its validity, as construed, in the same sense that the Government does here. See Trial Transcript, pp. 9, 17–18. In light of our disposition of the case, we have no occasion to consider whether the Government's argument directed to the clause, as construed, is properly before us.

clause" may be construed to prohibit a dealer, party to it, from selling through discounters, or whether General Motors could by unilateral action enforce the clause, so construed. We have here a classic conspiracy in restraint of trade: joint, collaborative action by dealers, the appellee associations, and General Motors to eliminate a class of competitors by terminating business dealings between them and a minority of Chevrolet dealers and to deprive franchised dealers of their freedom to deal through discounters if they so choose. Against this fact of unlawful combination, the "location clause" is of no avail. Whatever General Motors might or might not lawfully have done to enforce individual Dealer Selling Agreements by action within the borders of those agreements and the relationship which each defines, is beside the point. And, because the action taken constitutes a combination or conspiracy, it is not necessary to consider what might be the legitimate interest of a dealer in securing compliance by others with the "location clause," or the lawfulness of action a dealer might individually take to vindicate this interest.

The District Court decided otherwise. It concluded that the described events did not add up to a combination or conspiracy violative of the antitrust laws. But its conclusion cannot be squared with its own specific findings of fact. These findings include the essentials of a conspiracy within § 1 of the Sherman Act: That in the summer of 1960 the Losor Chevrolet Dealers Association, "through some of its dealer-members," complained to General Motors personnel about sales through discounters (Finding 34); that at a Losor meeting in November 1960 the dealers there present agreed to embark on a letter-writing campaign directed at enlisting the aid of General Motors (Finding 35); that in December and January General Motors personnel discussed the matter with every Chevrolet dealer in the Los Angeles area and elicited from

each a promise not to do business with the discounters (Finding 39); that representatives of the three associations of Chevrolet dealers met on December 15, 1960, and created a joint investigating committee (Finding 40); that the three associations then undertook jointly to police the agreements obtained from each of the dealers by General Motors; that the associations supplied information to General Motors for use by it in bringing wayward dealers into line, and that Chevrolet's O'Connor asked the associations to do so (Findings 41 and 42); that as a result of this collaborative effort, a number of Chevrolet dealers were induced to repurchase cars they had sold through discounters and to promise to abjure such sales in future (Finding 42).

These findings by the trial judge compel the conclusion that a conspiracy to restrain trade was proved.[16] The

---

[16] We note that, as in *United States* v. *Parke, Davis & Co.*, 362 U. S. 29, 44–45, the ultimate conclusion by the trial judge, that the defendants' conduct did not constitute a combination or conspiracy in violation of the Sherman Act, is not to be shielded by the "clearly erroneous" test embodied in Rule 52 (a) of the Federal Rules of Civil Procedure. That Rule in part provides: "Findings of fact shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge of the credibility of the witnesses." As in *Parke Davis, supra,* the question here is not one of "fact," but consists rather of the legal standard required to be applied to the undisputed facts of the case. See *United States* v. *Singer Mfg. Co.,* 374 U. S. 174, 194, n. 9; *United States* v. *Mississippi Valley Co.,* 364 U. S. 520, 526, and cases there cited.

Moreover, the trial court's customary opportunity to evaluate the demeanor and thus the credibility of the witnesses, which is the rationale behind Rule 52 (a) (see *United States* v. *Oregon State Med. Soc.,* 343 U. S. 326, 331–332), plays only a restricted role here. This was essentially a "paper case." It did not unfold by the testimony of "live" witnesses. Of the 38 witnesses who gave testimony, only three appeared in person. The testimony of the other 35 witnesses was submitted either by affidavit, by deposition, or in the form of an agreed-upon narrative of testimony given in the earlier

error of the trial court lies in its failure to apply the correct and established standard for ascertaining the existence of a combination or conspiracy under § 1 of the Sherman Act. See *United States* v. *Parke, Davis & Co.,* 362 U. S. 29, 44–45. The trial court attempted to justify its conclusion on the following reasoning: That each defendant and alleged co-conspirator acted to promote its own self-interest; that General Motors, as well as the defendant associations and their members, has a lawful interest in securing compliance with the "location clause" and in thus protecting the franchise system of distributing automobiles—business arrangements which the court deemed lawful and proper; and that in seeking to vindicate these interests the defendants and their alleged co-conspirators entered into no "agreements" among themselves, although they may have engaged in "parallel action."

These factors do not justify the result reached. It is of no consequence, for purposes of determining whether there has been a combination or conspiracy under § 1 of the Sherman Act, that each party acted in its own lawful interest. Nor is it of consequence for this purpose whether the "location clause" and franchise system are lawful or economically desirable. And although we regard as clearly erroneous and irreconcilable with its other findings the trial court's conclusory "finding" that there had been no "agreement" among the defendants and their alleged co-conspirators, it has long been settled that explicit agreement is not a necessary part of a Sher-

criminal proceeding before another judge. A vast number of documents were also introduced, and bear on the question for decision.

In any event, we resort to the record not to contradict the trial court's findings of *fact,* as distinguished from its conclusory "findings," but to supplement the court's factual findings and to assist us in determining whether they support the court's ultimate legal conclusion that there was no conspiracy.

man Act conspiracy—certainly not where, as here, joint and collaborative action was pervasive in the initiation, execution, and fulfillment of the plan. *United States* v. *Parke, Davis & Co., supra,* at 43; *United States* v. *Bausch & Lomb Optical Co.,* 321 U. S. 707, 722–723; *Federal Trade Comm'n* v. *Beech-Nut Packing Co.,* 257 U. S. 441, 455.

Neither individual dealers nor the associations acted independently or separately. The dealers collaborated, through the associations and otherwise, among themselves and with General Motors, both to enlist the aid of General Motors and to enforce dealers' promises to forsake the discounters. The associations explicitly entered into a joint venture to assist General Motors in policing the dealers' promises, and their joint proffer of aid was accepted and utilized by General Motors.

Nor did General Motors confine its activities to the contractual boundaries of its relationships with individual dealers. As the trial court found (Finding 39), General Motors at no time announced that it would terminate the franchise of any dealer which furnished cars to the discounters.[17] The evidence indicates that it had no intention of acting in this unilateral fashion.[18] On the contrary, overriding corporate policy with respect to

---

[17] The December letters to all dealers said only that "[i]n effect, in some instances" the arrangements in question might violate the unauthorized location clause of the Dealer Selling Agreement. No dealer was told, either by letter or in person, that *its* conduct violated the franchise agreement, and no dealer was warned that continuance of discount house or referral sales would result in termination of its franchise. Zone manager O'Connor did not regard his instructions from Detroit as authorizing him to go that far, and he was of the view that "the general letter [to all dealers] didn't suggest any such thing."

[18] We refer to this without considering whether General Motors could lawfully have taken such action.

proper dealer relations [19] dissuaded General Motors from engaging in this sort of wholly unilateral conduct, the validity of which under the antitrust laws was assumed, without being decided, in *Parke Davis, supra.*

As Parke Davis had done, General Motors sought to elicit from all the dealers agreements, substantially interrelated and interdependent, that none of them would do business with the discounters. These agreements were hammered out in meetings between nonconforming dealers and officials of General Motors' Chevrolet Division, and in telephone conversations with other dealers. It was acknowledged from the beginning that substantial unanimity would be essential if the agreements were to be forthcoming. And once the agreements were secured, General Motors both solicited and employed the assistance of its alleged co-conspirators in helping to police them. What resulted was a fabric interwoven by many strands of joint action to eliminate the discounters from participation in the market, to inhibit the free choice of franchised dealers to select their own methods of trade and to provide multilateral surveillance and enforcement. This process for achieving and enforcing the desired ob-

---

[19] James Roche testified, "It is not [General Motors'] practice to threaten dealers with termination of their franchise." Good dealers and dealer locations, he said, are hard to come by. In many dealerships, General Motors itself has invested substantial funds. Therefore, said Roche, "we would not want our people to go in and wave the franchise agreement, selling agreement, and threaten the dealer with termination in the event he didn't agree, after following—after reading a letter he was violating our agreement and should change his practice. Instead we expected that this would be handled on a sound, calm, sensible business-like approach."

There are also statutory inhibitions on the right of an automobile manufacturer to terminate dealer franchises. See Act of Aug. 8, 1956, c. 1038, § 2, 70 Stat. 1125, 15 U. S. C. § 1222 (1964 ed.); Kessler & Stern, Competition, Contract, and Vertical Integration, 69 Yale L. J. 1, 103–114 (1959).

jective can by no stretch of the imagination be described as "unilateral" or merely "parallel." See *Parke Davis, supra,* at 46; *Federal Trade Comm'n* v. *Beech-Nut Packing Co.,* 257 U. S. 441, 453; *United States* v. *Bausch & Lomb Optical Co.,* 321 U. S. 707, 722–723; *Interstate Circuit, Inc.* v. *United States,* 306 U. S. 208, 226; *United States* v. *Masonite Corp.,* 316 U. S. 265, 275; Turner, The Definition of Agreement Under the Sherman Act: Conscious Parallelism and Refusals to Deal, 75 Harv. L. Rev. 655 (1962).[20]

There can be no doubt that the effect of the combination or conspiracy here was to restrain trade and commerce within the meaning of the Sherman Act. Elimination, by joint collaborative action, of discounters from access to the market is a *per se* violation of the Act.

In *Klor's, Inc.* v. *Broadway-Hale Stores, Inc.,* 359 U. S. 207, the Court was confronted with the question whether "a group of powerful businessmen may act in concert to deprive a single merchant, like Klor, of the goods he needs to compete effectively." 359 U. S., at 210. The allegation was that manufacturers and distributors of electrical appliances had conspired among themselves and with a major retailer, Broadway-Hale, "either not to sell to Klor's [Broadway-Hale's next-door neighbor and competitor] or to sell to it only at discriminatory prices and highly unfavorable terms." 359 U. S., at 209. The Court concluded that the alleged group boycott of even a single trader violated the statute [21] without regard to the

---

[20] Compare *Klein* v. *American Luggage Works, Inc.,* 323 ,F. 2d 787 (C. A. 3d Cir. 1963), and *Graham* v. *Triangle Publications, Inc.,* 233 F. Supp. 825 (D. C. E. D. Pa. 1964), aff'd *per curiam,* 344 F. 2d 775 (C. A. 3d Cir. 1965), discussed in Fulda, Individual Refusals to Deal: When Does Single-Firm Conduct Become Vertical Restraint? 30 Law & Contemp. Prob. 590, 592–597 (1965).

[21] The complaint in *Klor's* charged a violation of § 2 of the Sherman Act, as well as of § 1. In the present case, the Government did not charge the appellees under § 2, which provides that "Every

reasonableness of the conduct in the circumstances. Group boycotts of a trader, said the Court, are among those "classes of restraints which from their 'nature or character' were unduly restrictive . . . ." 359 U. S., at 211. This was not new doctrine, for it had long been recognized that "there are certain agreements or practices which because of their pernicious effect on competition and lack of any redeeming virtue are conclusively presumed to be unreasonable and therefore illegal without elaborate inquiry as to the precise harm they have caused or the business excuse for their use," and that group boycotts are of this character. *Northern Pac. R. Co.* v. *United States,* 356 U. S. 1, 5. See also *Fashion Originators' Guild of America, Inc.* v. *Federal Trade Comm'n,* 312 U. S. 457, and *Eastern States Retail Lumber Dealers' Assn.* v. *United States,* 234 U. S. 600, 613–614, neither of which involved price-fixing.

The principle of these cases is that where businessmen concert their actions in order to deprive others of access to merchandise which the latter wish to sell to the public, we need not inquire into the economic motivation underlying their conduct. See Barber, Refusals To Deal Under the Federal Antitrust Laws, 103 U. Pa. L. Rev. 847, 872–885 (1955). Exclusion of traders from the market by means of combination or conspiracy is so inconsistent with the free-market principles embodied in the Sherman Act that it is not to be saved by reference to the need for preserving the collaborators' profit margins or their system for distributing automobiles, any more than by reference to the allegedly tortious conduct against which a combination or conspiracy may be di-

---

person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations, shall be deemed guilty of a misdemeanor . . . ." 15 U. S. C. § 2 (1964 ed.).

rected—as in *Fashion Originators' Guild of America, Inc.*
v. *Federal Trade Comm'n, supra*, at 468.

We note, moreover, that inherent in the success of the
combination in this case was a substantial restraint upon
price competition—a goal unlawful *per se* when sought
to be effected by combination or conspiracy. *E. g.*,
*United States* v. *Parke, Davis & Co.*, 362 U. S. 29, 47;
*United States* v. *Socony-Vacuum Oil Co.*, 310 U. S. 150,
223. And the *per se* rule applies even when the effect
upon prices is indirect. *Simpson* v. *Union Oil Co.*, 377
U. S. 13, 16–22; *Socony-Vacuum Oil Co., supra*.

There is in the record ample evidence that one of the
purposes behind the concerted effort to eliminate sales
of new Chevrolet cars by discounters was to protect
franchised dealers from real or apparent price competi-
tion. The discounters advertised price savings. See
n. 7, *supra*. Some purchasers found and others believed
that discount prices were lower than those available
through the franchised dealers. *Ibid.* Certainly, com-
plaints about price competition were prominent in the
letters and telegrams with which the individual dealers
and salesmen bombarded General Motors in November
1960.[22] (Finding 38.) And although the District Court
found to the contrary, there is evidence in the record
that General Motors itself was not unconcerned about
the effect of discount sales upon general price levels.[23]

---

[22] Evidence on this subject was admitted solely for the purpose of
showing the dealers' state of mind, rather than to prove the existence
of actual price-cutting by the discounters. But the collaborators'
state of mind is of significance here.

[23] In an inter-office memorandum, circulated among General Motors
officials immediately prior to formulation of corporate policy *vis-à-vis*
the discounters, it was stated that "It would appear that one of the
real hazards of condoning this type of operation is that discounted
prices are freely quoted to a large portion of the public." Moreover,
we note that some discounters advertised that they would finance
new-car purchases at an interest rate of $5\frac{1}{2}\%$, a rate substantially

The protection of price competition from conspiratorial restraint is an object of special solicitude under the antitrust laws. We cannot respect that solicitude by closing our eyes to the effect upon price competition of the removal from the market, by combination or conspiracy, of a class of traders. Nor do we propose to construe the Sherman Act to prohibit conspiracies to fix prices at which competitors may sell, but to allow conspiracies or combinations to put competitors out of business entirely.

Accordingly, we reverse and remand to the United States District Court for the Southern District of California in order that it may fashion appropriate equitable relief. See *United States* v. *Parke, Davis & Co., supra,* at 47–48.

*It is so ordered.*

Mr. Justice Harlan, concurring in the result.

Although I consider that *United States* v. *Parke, Davis & Co.,* 362 U. S. 29, decided in 1960, represents basically unsound antitrust doctrine, see my dissenting opinion, 362 U. S., at 49, I see no escape from the conclusion that it controls this case. *Parke Davis* held that a manufacturer cannot maintain resale prices by refusing to sell to those who do not follow his suggested prices if the refusal is attended by concerted action with his customers, even though he may unilaterally so conduct himself. See *United States* v. *Colgate & Co.,* 250 U. S. 300. Although *Parke Davis* related to alleged price-fixing, I have been unable to discern any tenable reason for differentiating it from a case involving, as here, alleged boy-

---

lower than that available at franchised Chevrolet dealers through G. M. A. C., a subsidiary of General Motors Corporation. See n. 7, *supra.* Finally, it is conceded that General Motors is intensely concerned that each of its dealers has an adequate "profit opportunity" (see Finding 17), a concern which necessarily involves consideration of the price realized by dealers.

cotting. The conclusion that *Parke Davis* governs the present case is therefore unavoidable, given the undisputed evidence that General Motors acted in concert with its dealers in enforcing the location clause. In my opinion, however, General Motors is not precluded from enforcing the location clause by unilateral action, and I find nothing in the Court's opinion to the contrary.

On this basis I concur in the judgment of the Court.