Irvin RUMPLE, Appellant-Plaintiff,

v.

The BLOOMINGTON HOSPITAL; The Southern Indiana Radiological Association; and The Credit Bureau of Monroe County, Appellees-Defendants.

No. 1–680A144.

Court of Appeals of Indiana, First District.

July 13, 1981.
Rehearing Denied August 20, 1981.

Edward F. McCrea, McCrea & McCrea, Bloomington, for appellant-plaintiff.

Len E. Bunger, Joseph D. O'Connor, III, Bunger, Harrell & Robertson, Bloomington, William S. Hall, H. Kim TeKolste, Hall, Render & Killian, Indianapolis, for Indiana Hospital Association, Inc.

RATLIFF, Judge.

## STATEMENT OF THE CASE

Irvin Rumple (Rumple) appeals from the declaratory judgment of the Monroe Superior Court that he owes the Southern Indiana Radiological Association (SIRA) the sum of twenty-three dollars and fifty cents for the interpretation of x-rays taken at Bloomington Hospital. We affirm.

## STATEMENT OF THE FACTS

Rumple's son, Brent, was injured in a motorcycle accident on August 28, 1976, and was taken to Bloomington Hospital for treatment of his injuries. X-rays of Brent's right wrist were requested by the emergency room physician, Dr. Walker. Upon reviewing the x-rays, Dr. Walker diagnosed a fracture of Brent's right wrist and Dr. Doster, an orthopedic surgeon, was asked to treat the fracture. Dr. Doster examined the x-rays, reduced the fracture, and placed Brent's wrist in a cast. Dr. Hammer, a radiologist, reviewed the x-rays that evening, making an official interpretation which confirmed Dr. Doster's diagnosis.

The review of the x-rays by Dr. Hammer was pursuant to Bloomington Hospital's policy that each x-ray taken must be interpreted by a physician whose credential files reflect the training, experience, and current competence required for all aspects of radiological services. The only physicians who have applied for privileges to interpret x-rays at Bloomington Hospital since inception of the policy in 1948 have been radiologists. All radiologists presently practicing at Bloomington Hospital are shareholders of SIRA, a medical corporation. They do not order x-rays to be taken, but only interpret x-rays ordered by other physicians. Accordingly, a bill of twenty-three dollars and fifty cents was sent by SIRA to Rumple for Dr. Hammer's interpretation of the x-rays of Brent's wrist.

Rumple refused to pay the bill and filed a complaint for declaratory judgment requesting the Monroe Superior Court II to find that he did not owe SIRA the sum of twenty-three dollars and fifty cents. On September 29, 1979, the trial court entered its judgment. However, after consideration of the plaintiff's motion to correct errors, the trial court modified its previous judgment and entered judgment on January 16, 1980, for the defendants, Bloomington Hospital, SIRA, and the Credit Bureau of Monroe County. The court, in its judgment, found that Rumple agreed to the services rendered by Dr. Hammer since he consented to such radiological services as Dr. Doster deemed reasonable and necessary; that a patient entering a private hospital agrees to abide by all reasonable rules, regulations, policies, and practices governing the nature of services provided and thus a promise to pay for services which are rendered is implied; that the policy of Bloomington Hospital requiring the interpretation of x-rays by a radiologist is reasonable and thus Rumple impliedly promised to pay for Dr. Hammer's services; and that SIRA does not maintain a monopoly on the interpretation of x-rays at Bloomington Hospital.

## ISSUES

Rumple has raised the following issues, which we have restated, for our consideration:

1. Did the trial court err in finding that Rumple had expressly consented to Dr. Hammer's services?

2. Does the policy of Bloomington Hospital which requires all patient x-rays to be

interpreted by a staff radiologist constitute an unconstitutional interference with Rumple's fundamental right of privacy?

3. Did the trial court err in finding that SIRA does not maintain an illegal monopoly in the interpretation of x-rays?

## DECISION

*Issue One*

Rumple alleges the trial court's finding that he consented to Dr. Hammer's services, and thus is obligated to pay for them, is erroneous for two reasons. First, he argues that there was no informed consent, and secondly, he argues that the consent form was void as a contract of adhesion. Since the trial court, pursuant to a request by Rumple under Ind.Rules of Procedure, Trial Rule 52(A), entered special findings of fact and conclusions of law, we will not reverse the trial court's findings or judgment unless they are clearly erroneous. *Seco Chemicals, Inc. v. Stewart,* (1976) 169 Ind.App. 624, 349 N.E.2d 733.

Rumple states that he understood the consent form which he signed only to authorize treatment necessary for setting his son's wrist and that aside from very general language in the form, no discussion of radiology, and specifically SIRA, occurred. The consent form which Rumple signed read in pertinent part:

"2. I hereby authorize and direct the above-named surgeon and/or his associates to provide such additional services for me as he or they may deem reasonable and necessary, including, but not limited to, the administration and maintenance of the anesthesia, and the *performance of services involving* pathology and *radiology,* and I hereby consent thereto.

"3. I understand that the above-named surgeon and his associates or assistants will be occupied solely with performing such operation, and the persons in attendance at such operation for the purpose of administering anesthesia, and the person or persons performing services involving pathology and radiology, are not the agents, servants or employees of Bloomington Hospital nor of any surgeon, but are independent contractors and as such are the agents, servants, or employees of myself." (Emphasis added.)

Rumple argues that from this form, appellees "assumed the discretion to impose unauthorized services upon appellant" in violation of the doctrine of informed consent. The Indiana Hospital Association, which has filed an amicus curiae brief, contends the doctrine of informed consent is not applicable to the case at hand. We agree.

 As stated by Judge Miller in *Revord v. Russell,* (1980) Ind.App., 401 N.E.2d 763, 767: "The issue in informed consent is whether the patient was subjected to the inherent risks of the proposed treatment without being permitted to intelligently reject or accept treatment; . . ." The doctrine of informed consent usually arises in a situation where a physician failed to fulfill his or her duty to inform the patient of the risks of proposed treatment or where the physician was liable for treatment of the patient beyond that which was authorized. Neither of those situations are present in the case at bar.

Rumple also alleges the consent form is a contract of adhesion and thus is void. He states that the form is a standardized form which was presented to him by a party with greater bargaining power. He contends there was no bargaining between the parties as to its contents; rather, if he wanted medical treatment for his son, then he had to sign the form as presented. This lack of negotiation, he contends, makes the contract unenforceable, and he cites us to *Weaver v. American Oil Co.,* (1971) 257 Ind. 458, 276 N.E.2d 144. We find that the present case does not fall within the rule of *Weaver* and its progeny.

 In *Weaver,* our supreme court held that a hold harmless clause in a service station lease was unconscionable and unenforceable. Each year Mr. Weaver, a man with only one and one-half years of high school education, was presented a printed lease by the agent of American Oil and was told to sign it. Mr. Weaver never read the lease, and the lease, which had been drafted

by attorneys for American Oil, was not explained to him prior to his signing it. Our supreme court recognized that the standardized contract is used primarily by enterprises with stronger bargaining power. However, in holding that the standardized contract provisions in *Weaver* were unenforceable, the court did not so hold solely as a result of the standardized character of the contract, but determined that the provisions were unconscionable. As stated by Judge Hoffman in *Dan Purvis Drugs, Inc. v. Aetna Life Insurance Co.*, (1980) Ind.App., 412 N.E.2d 129, 131, *trans. denied*:

"A close reading of *Weaver* indicates that a contract may be declared unenforceable due to unconscionability when there is a great disparity in bargaining power which leads the party with the lesser power to sign a contract unwillingly or unaware of its terms. In addition, the contract must be ' "such as no sensible man not under delusion, duress or in distress would make, and such as no honest and fair man would accept." ' [citation omitted]."

Thus contrary to Rumple's assertion, a standardized contract is not unenforceable merely because of the unequal bargaining power of the parties. There must also be a showing that the contract is unconscionable, *i. e.*, one which contains unreasonable or unknown terms *and* is the product of inequality of bargaining power. *Piskorowski v. Shell Oil Co.*, (1980) Ind.App., 403 N.E.2d 838, *trans. denied*. Rumple failed to make such a showing in this case.

■ Rumple is an individual with a bachelor's degree in aeronautical engineering and a master's degree in psychology. He read the consent form at the time he signed it and acknowledged at trial that he understood its terms; therefore, there were no unknown terms in the consent. Neither do we find the terms of the consent to be unreasonable. The consent only allows doctors to perform necessary and reasonable medical services. It does not allow them to perform unnecessary medical services. The consent to allow the performance of reasonable and necessary medical treatment would not be unconscionable as defined by our supreme court in *Weaver v. American Oil Co., supra*, 276 N.E.2d at 146:

" 'An "unconscionable contract" has been defined to be such as no sensible man not under delusion, duress or in distress would make, and such as no honest and fair man would accept.' " (Citation omitted.)

Rumple, in exchange for his liability for the services rendered, received medical treatment for his son. He was not encumbering himself with a heavy liability in exchange for a small gain as was found to exist in *Weaver v. American Oil Co., supra*. Therefore, the consent form is not unconscionable. Rumple has failed to show that the trial court's finding that he consented to Dr. Hammer's services is clearly erroneous.

*Issue Two*

■ Rumple's second allegation of error is that the trial court's judgment is erroneous because Bloomington Hospital's policy of requiring a radiologist to interpret every x-ray taken violates a patient's fundamental right of privacy. Specifically, he argues the policy interferes with a patient's right of control over his or her medical care, especially the right to refuse treatment. Hospital and SIRA recognize the principle that a person has the right to his or her bodily integrity; however, they contend that since Rumple consented to the x-rays, this principle is not applicable. Furthermore, they allege the hospital's policy does not constitute state action.

We recognize that the constitutional right of privacy against unlawful governmental invasions which emanates from the federal constitution, *Roe v. Wade*, (1973) 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147, has been held to include the right of a person against unwanted infringements of bodily integrity in appropriate circumstances. *Superintendent of Belchertown State School v. Saikewicz*, (1977) 373 Mass. 728, 370 N.E.2d 417; *In re Quinlan*, (1976) 70 N.J. 10, 355 A.2d 647, *cert. denied sub nom. Garger v. New Jersey*, (1976) 429 U.S. 922, 97 S.Ct. 319, 50 L.Ed.2d 289. The right to refuse medical treatment has been upheld in cases where

an elderly person refused treatment for gangrenous legs, *In the matter of Quackenbush*, (1978) 156 N.J.Super. 282, 383 A.2d 785, where an individual refused a surgical biopsy for cancer, *In re Yetter*, (1973) 62 Pa.D. & C.2d 619, and where an individual sought removal of a life-sustaining respirator, *Satz v. Perlmutter*, (1978) Fla.App., 362 So.2d 160, *approved*, (1980) Fla., 379 So.2d 359. However in the present case, we need not decide whether Bloomington Hospital's policy constitutes state action and violates its patients' right to refuse treatment because Rumple lacks the requisite standing to litigate this issue.

In order to have standing to litigate this constitutional issue, Rumple must show that he was injured by the challenged action of Bloomington Hospital. *Arlington Heights v. Metropolitan Housing Corp.*, (1977) 429 U.S. 252, 97 S.Ct. 555, 50 L.Ed.2d 450. The injury may be indirect, but must be traceable to the defendant's action. *Id.* Assuming that Rumple could establish the Hospital's policy harmed him, he does not assert any personal right under the constitution. He alleges as the basis of his claim that the Hospital's policy infringes its patients' fundamental right to privacy. He did not establish that he was a patient of Bloomington Hospital subject to this policy. Indeed, this whole controversy arose out of medical treatment rendered to his son. This is not sufficient for the purpose of establishing standing. As stated by Justice Powell in *Warth v. Seldin*, (1975) 422 U.S. 490, 509, 95 S.Ct. 2197, 2210, 45 L.Ed.2d 343, 361, "In short the claim of these petitioners falls squarely within the prudential standing rule that normally bars litigants from asserting the rights or legal interests of others in order to obtain relief from injury to themselves." Although there are exceptions to this judicial rule, they do not apply in this case. *See, e. g., Warth v. Seldin, supra; Doe v. Bolton*, (1973) 410 U.S. 179, 93 S.Ct. 739, 35 L.Ed.2d 201; *NAACP v. Alabama ex rel. Patterson*, (1958) 357 U.S. 449, 78 S.Ct. 1163, 2 L.Ed.2d 1488.

Rumple also contends the policy of Bloomington Hospital abridges another facet of the right to privacy, that of the realm of family life. He argues the right of privacy includes the right of parents to raise their children and to make important decisions concerning their children's care. This right, he states, was abridged by Bloomington Hospital's policy because the policy did not allow him to direct his son's medical treatment. Even were we to assume that the right of privacy includes the right of a parent to direct his or her children's medical treatment and that the hospital's policy constituted state action, Rumple's argument is without merit. Any right which he had to direct his son's medical treatment was not infringed since Rumple consented to the taking of the x-rays of his son's wrist. To allege that the consent was effective only for the taking of the x-ray and not its interpretation is absurd, as most patients are interested in the end result of the x-ray which is the interpretation by a qualified physician. Furthermore, nothing in the record reflects that Rumple refused to allow the x-ray to be interpreted by a radiologist. Bloomington Hospital's policy did not deprive Rumple of any right to direct his son's medical treatment.

*Issue Three*

Rumple contends there is an exclusive contract between Bloomington Hospital and SIRA which violates Acts 1907, ch. 243, § 1, pp. 490–91 (current version at Ind.Code 24–1–2–1 (Supp.1979)) in several respects. First, he alleges the contract or agreement establishes an illegal monopoly, which restrains competition, in favor of SIRA for the interpretation of x-rays. Secondly, he alleges the contract or agreement is an illegal tying arrangement. Bloomington Hospital and SIRA assert there is no exclusive contract or agreement between them, and further, that neither of them has acted in any manner so as to restrain competition. They also assert that no illegal tying arrangement exists because an x-ray and its interpretation constitute one product, and because, assuming they are separate products, Bloomington Hospital has no interest in the tied product.

Acts 1907, ch. 243, § 1, pp. 490–91, which was modified in 1978 and currently is at IC 24–1–2–1 provided:

"SEC. 1. [E]very scheme, design, understanding, contract, combination in the form of a trust or otherwise, or conspiracy in restraint of trade or commerce, or to create or carry out restrictions in trade or commerce, or to deny or refuse to any person or persons full participation, on equal terms with others, in any telegraphic service transmitting matter prepared or intended for public use, or to limit or reduce the production, or increase or reduce the price of merchandise or any commodity, natural or artificial, or to prevent competition in manufacturing, within or without this state, is hereby declared to be illegal, . . . *Provided, however,* That it shall be a good defense to any action growing out of any violation of the provisions of this act or any other act or common law relating to the subject-matter of this act if the defendant shall plead and by a fair preponderance of the evidence prove that such violation is not in restraint of trade or commerce or does not restrict trade or commerce or limit or reduce the production or increase or reduce the price of merchandise or any commodity natural or artificial or prevent competition in manufacturing."

This section has been held to be modeled after section 1 of the Sherman Antitrust Act, 15 U.S.C. 1 (1976), and has been interpreted consistent with federal law interpreting 15 U.S.C. 1. *Photovest Corp. v. Fotomat Corp.,* (7th Cir. 1979) 606 F.2d 704, *cert. denied,* 445 U.S. 917, 100 S.Ct. 1278, 63 L.Ed.2d 601; *Orion's Belt, Inc. v. Kayser-Roth Corp.,* (S.D.Ind.1977) 433 F.Supp. 301.

In *America's Best Cinema Corp. v. Ft. Wayne Newspapers, Inc.,* (N.D.Ind.1972) 347 F.Supp. 328, 331, Judge Eschbach discussed the burden which a plaintiff must meet to prove a conspiracy or combination in restraint of trade in violation of 15 U.S.C. 1 (1976):

"In order to prevail on Count I of their action the burden was upon the plaintiffs to show that the defendants had combined or conspired in restraint of trade. A combination or conspiracy is established under section one of the Sherman Act by evidence of 'joint, collaborative action,' *United States v. General Motors Corp.,* 384 U.S. 127, 140, 86 S.Ct. 1321, [1327] 16 L.Ed.2d 415 (1966), or action pursuant to a 'unity of purpose or a common design and understanding,' *Kiefer-Stewart Co. v. Joseph E. Seagram and Sons, Inc.,* 340 U.S. 211, 213, 71 S.Ct. 259, 261, 95 L.Ed. 219 (1951). If such combination or conspiracy 'unreasonably' restrains competition, section one is violated. *Northern Pacific R. Co. v. United States,* 356 U.S. 1, 78 S.Ct. 514, 2 L.Ed.2d 545 (1958)."

Thus, Rumple must prove a scheme, design, understanding, contract, conspiracy, or agreement between Bloomington Hospital and SIRA which had as either its purpose or effect an unreasonable restraint of trade. *See Times-Picayune v. United States,* (1953) 345 U.S. 594, 73 S.Ct. 872, 97 L.Ed. 1277. This, as the trial court found, he has failed to do.

■ Rumple states that SIRA through its alleged exclusive contract with Bloomington Hospital has gained a monopoly, is free to set prices as it wishes, and has ensured that no competition will emerge.[1]

---

1. These allegations made by Rumple appear to be asserting that SIRA is an illegal monopoly in and of itself. Such an assertion would not be governed by Acts 1907, ch. 243, § 1, pp. 490–91 (current version at IC 24–1–2–1 (Supp.1979)) which requires an agreement between two entities, *Orion's Belt, Inc. v. Kayser-Roth Corp., supra.* Acts 1907, ch. 243, § 2, p. 491 (current version at Ind.Code 24–1–2–2 (Supp.1979)), however, does make it illegal for any person to monopolize or attempt to monopolize any part of trade or commerce within this state. Acts 1907, ch. 243, § 2, p. 491, was modeled after Section 2 of the Sherman Act, 15 U.S.C. 2 (1976), and has been interpreted consistently with that act. *Photovest Corp. v. Fotomat Corp., supra.* To the extent that Rumple is asserting SIRA, without regard to any agreement with Bloomington Hospital, is an illegal monopoly, such an argument is waived for failure to cite any authority or make a cogent argument. Ind. Rules of Procedure, Appellate Rule 8.3(A)(7).

He cites in support of his contention *Goldfarb v. Virginia State Bar*, (1975) 421 U.S. 773, 95 S.Ct. 2004, 44 L.Ed.2d 572, and *Group Health Cooperative v. King County Medical Society*, (1951) 39 Wash.2d 586, 237 P.2d 737. We find neither case sufficiently analogous to be controlling in the present case.

In *Goldfarb*, the United States Supreme Court found a *per se* violation of § 1 of the Sherman Act. The Fairfax County Bar Association had published a minimum-fee schedule for legal fees. This schedule was enforced through the prospect of professional discipline by the Virginia State Bar. When Goldfarb and his wife needed a title examination in order to buy a home, they were unable to find any attorney who would examine the title for less than the fee prescribed in the published minimum-fee schedule. The argument by the County Bar Association that the fee schedule was purely advisory was rejected by the United States Supreme Court. The schedule was a "fixed, rigid price floor" which was enforced through the prospect of professional discipline and was shown to have restrained competition among attorneys in Fairfax County by the fact that the Goldfarbs could not find one attorney to perform the title examination for a fee less than the fee contained in the published schedule. Therefore in *Goldfarb*, there existed an agreement between the Fairfax County Bar and the Virginia State Bar to fix the prices for legal services. This agreement constituted a *per se* violation of § 1 of the Sherman Act. *See United States v. Socony-Vacuum Oil Co.*, (1940) 310 U.S. 150, 60 S.Ct. 811, 84 L.Ed. 1129.

■ In the present case, Rumple failed to show any agreement or understanding between Bloomington Hospital and SIRA to fix prices. He contends an exclusive contract exists between Bloomington Hospital and SIRA which allows SIRA to fix prices. The evidence, however, does not bear out Rumple's contention that an exclusive contract exists. Bloomington Hospital began a policy in 1948 of requiring an official interpretation of all x-rays by a physician whose credential files at the hospital reflected the training, experience, and current competence required for all aspects of radiological services. It is true that the only physicians who meet those requirements are shareholders of SIRA; however, the record shows that these physicians do not have the exclusive right to interpret all x-rays at Bloomington Hospital. Rather, the record reflects that if a physician who meets those requirements applies for privileges at Bloomington Hospital, he or she would be given a *pro rata* share of x-rays to interpret, regardless of whether he or she is a member of SIRA. The evidence simply does not show an exclusive contract between Bloomington Hospital and SIRA. Neither does it show any agreement between the two to fix prices, for SIRA solely determines what prices shall be charged for the services rendered by its shareholders.

In *Group Health Cooperative v. King County Medical Society, supra*, the plaintiff, Group Health Cooperative of Puget Sound (Cooperative), brought an action against the King County Medical Society (Society), King County Medical Service Corp. (Service Corp.), King County Medical Service Bureau (Bureau), and several hospitals for injunctive relief and damages resulting from anticompetitive conduct of the defendants. Cooperative was a nonprofit corporation which was engaged in industrial contract medicine. Society, a component society of the Washington State Medical Association, became concerned with the growth of contract medicine, particularly industrial contracts. It condemned certain industrial contract medicine and appointed a committee to study the problem. The committee recommended that the only practical method to deal with industrial contract practice was to organize the members of the profession into an organization to compete with the existing organizations of contract practice. Society adopted a motion approving the formation of such a permanent organization and Service Corp. and Bureau were organized pursuant to this resolution. Bu

reau was composed of doctors under contract with Service Corp. to furnish prepaid contract service to persons covered by industrial contracts negotiated by Service Corp. Both Bureau and Service Corp. were composed exclusively of members of Society.

After establishing this competing industrial contract plan in 1933, Society began on a course of conduct to limit Bureau and Service Corp.'s competition. The membership in Society was necessary to physicians in order to obtain hospital privileges, to obtain certification by specialty boards, and to obtain consultation services from other doctors. However, Society began denying membership to all new applicants engaged in industrial contract practice under plans other than those negotiated by Service Corp. and administered by Bureau. Furthermore, Society adopted a by-law making it gross misconduct for any member of Society to engage in a contract practice which had not been authorized by Society. Of course, the only plan ever authorized by Society was that of Service Corp. and Bureau. In 1936, Society's board of trustees adopted a motion that a resolution be presented to Society which stated that any of its members who consult with a physician who is not a member of Society and who is doing contract practice on a contract patient is guilty of unethical conduct. The defendant hospitals adopted by-laws, submitted by members of the Bureau at the instigation of Society and Service Corp., under which access to the hospitals was denied to any physician not a member of the Society.

The Washington Supreme Court found that Society, Bureau, and Service Corp. had violated Article XII, § 22 of the Washington Constitution, which reads as follows:

"Monopolies and trusts shall never be allowed in this state, and no incorporated company, copartnership, or association of persons in this state shall directly or indirectly combine or make any contract with any other incorporated company, foreign or domestic, through their stockholders, or the trustees, or assignees of such stockholders, or with any copartnership or association of persons, or in any manner whatever, for the purpose of fixing the price or limiting the production or regulating the transportation of any product or commodity...."

The Court found that a combination or arrangement first came into existence in April 1933 when Society caused the Service Corp. and Bureau to be organized. The purpose of the combination was to preempt and control all contract medicine; thus it was found to violate Article XII, § 22 of the constitution since the court had previously held that "where the element of controlled or limited production is present, the contract or combination is declared to be monopolistic and hence void under the constitution [Citation omitted]." *Group Health Cooperative v. King County Medical Society, supra,* 237 P.2d at 766.

Rumple argues that the alleged arrangement between Bloomington Hospital and SIRA establishes a monopoly in the same way as the activities in *Group Health Cooperative v. King County Medical Society, supra.* He persistently makes the utterly fallacious argument that "[i]t was undisputed that there is an arrangement whereby all x-rays taken at the Bloomington Hospital must be interpreted by a SIRA radiologist." Appellant's Reply Brief at 14. As we have previously discussed, the record contains not one scintilla of evidence that such an agreement exists. What the record does show is that Bloomington Hospital adopted a policy in 1948, before the existence of SIRA, that each x-ray must be officially interpreted by a physician whose credential files at the hospital reflect the training, experience, and current competence required for all aspects of radiological services, *i. e.,* a radiologist. The policy did not require that *only* SIRA shareholders be allowed to make the official interpretation. As we have stated, the evidence in the record reflects that Bloomington Hospital would allow *any* physician with the proper credential files to make the official interpretation. Unlike the medical associations in *Group Health Cooperative v. King County Medical Society, supra,* Bloomington Hospital did not

have an agreement with SIRA to make SIRA the sole group of physicians allowed to interpret x-rays at Bloomington Hospital.

Assuming that Rumple showed the policy of Bloomington Hospital was adopted at the insistence of SIRA such that it would constitute a scheme, design, or understanding, there was no showing that its purpose was to restrain competition. Bloomington Hospital contended, and the trial court found, that the policy was reasonable and served to decrease morbidity and mortality. Rumple has made no showing that this finding was clearly erroneous.

Also, were we to assume there existed a scheme or understanding between Bloomington Hospital and SIRA which resulted in the adoption of the Hospital's policy, there has been no showing that the policy has the effect of restraining competition. Any physician who meets the qualifications may render the official interpretation of the x-ray. Thus the policy does not restrain competition among physicians who do possess the necessary qualifications. Neither does it restrain competition between those physicians who do possess the qualifications and those who do not. Any physician who does not have the necessary qualifications may make the official interpretation if he or she takes the necessary steps to become qualified to do so. If the physician does take the necessary steps to acquire the qualifications, he or she is not required to give up his or her practice in other areas of medicine as was required in *Group Health Cooperative v. King County Medical Society, supra.* Thus, a general practitioner who wants to make official interpretations of x-rays and continue his or her general practice may do so. Also, we note that the policy of Bloomington Hospital does not foreclose the general practitioner from interpreting the x-rays of his or her patient. The policy merely requires that in addition to the interpretation of the general practitioner, there must be an official interpretation by a physician who possesses the necessary qualifications. Such a situation is far from the one encountered in *Group Health Cooperative v. King County Medical Society, supra,* where Society, Service Corp., and Bureau set upon a course of conduct to eliminate all competition to Service Corp.'s industrial contracts.

Rumple's final allegation is that the arrangement between SIRA and Bloomington Hospital is an illegal tying arrangement, which is a violation of Acts 1907, ch. 243, § 1, pp. 490–91 (current version at IC 24–1–2–1 (Supp.1979)). The essence of the illegality of a tying arrangement is the wielding of economic power when a seller exploits his or her dominant position in one market to expand into another market. *Times-Picayune v. United States,* (1953) 345 U.S. 594, 73 S.Ct. 872, 97 L.Ed. 1277. A tying arrangement arises when a party agrees to sell one product but only on the condition that the buyer purchase a different product or agree that he or she will not purchase that product from anyone else. *Northern Pacific Railway Co. v. United States,* (1958) 356 U.S. 1, 78 S.Ct. 514, 2 L.Ed.2d 545. It is *per se* illegal under § 1 of the Sherman Act when the seller "has sufficient economic power with respect to the tying product to appreciably restrain free competition in the market for the tied product and a 'not insubstantial' amount of interstate commerce is affected [citations omitted]." *Id.,* 356 U.S. at 6, 78 S.Ct. at 518–19, 2 L.Ed. at 550. Thus, in order to prove an illegal tying arrangement, a plaintiff must show that there are two separate and distinct products; that the defendant has sufficient economic power in the market for the tying product to impose significant restrictions in the tied product market; and the amount of commerce affected in the tied product market is not insubstantial.

Rumple asserts that all three requirements for an illegal tying arrangement have been met. He states that the tying product is admission to and treatment by Bloomington Hospital, while the tied product is a radiological interpretation; SIRA dominates its market; and not an insubstantial amount of commerce is impli-

cated. We need not discuss this assertion, for Rumple has failed to show that Bloomington Hospital, the seller of the tying product, has an economic interest in the tied product or was at least receiving a commission on the interpretation of x-rays. *See Ohio-Sealy Mattress Manufacturing Co. v. Sealy, Inc.*, (7th Cir. 1978) 585 F.2d 821; *Moore v. Jas. H. Matthews & Co.*, (9th Cir. 1977) 550 F.2d 1207; *Venzie Corp. v. United States Mineral Products Co., Inc.*, (3rd Cir. 1975) 521 F.2d 1309. Assuming that two distinct products existed in this case, the record fails to establish any effort by Bloomington Hospital to use its economic position in one market to invade and dominate the radiological interpretation market.

Having found no violation of the Indiana antitrust statute, the judgment is affirmed.

Judgment affirmed.

ROBERTSON, J., concurs.

NEAL, P. J., dissents with opinion.

NEAL, Presiding Judge, dissenting.

I respectfully dissent from the majority opinion.

The linchpin for the justification of the charge to Rumple is the form signed by him which authorized the surgeon to "provide such additional services . . . as he . . . may deem reasonable and necessary including . . . radiology."

The doctor who treated Rumple was an orthopedic surgeon, Dr. Eugene Doster, Jr. He testified that he was adequately trained to treat the fracture and interpret the x-ray, and had no need to consult the radiologist. He stated that from start to finish he read the x-rays, reduced the fracture, applied the cast, and made the follow-up examinations without any reference to or consultation with the radiologist or his report. The report was not made until the following day after the patient was long since gone. He testified that he probably received the report in due course, but did not know if he looked at it. He tried to read as many of them as he could. While these readings by a radiologist were referred to as "confirmative interpretation," there is nothing in the record that they were ever consulted as such. In answer to the questions concerning the merits of such a rule requiring an interpretation by a radiologist of every x-ray, he stated "I enjoy the company." He stated that a subsequent examination of Dr. Hammer's report added nothing to his own knowledge.

This incident, while involving only $23.56, mirrors at least one cause of the burgeoning and rapacious cost of medical care. I would make no attempt to instruct the medical profession on what procedures are necessary, and what are not. However, here we are discussing a charge to a patient for a service not asked for by the treating surgeon, not used by the treating surgeon, or consulted by the treating surgeon, or anyone else. The form signed by Rumple authorized services deemed reasonable and necessary by the surgeon. He did not deem them necessary and did not use them.

It is my opinion that the person responsible for payment of the medical service, in absence of prior express approval, is not obligated under the omnibus consent form unless it is demonstrated that the service was in some way connected with the patient's care, and contributed in some degree to the diagnosis or treatment, or the confirmation of the diagnosis or treatment, of the health problem of the patient which is under investigation.

Here the interpretation and report was but an empty institutional ritual performed in obedience to a sweeping rule. Dr. Hammer's report was buried, unread, in a file, where it reposed until disinterred by a billing clerk.