Joseph **REITER** and LeRoy Guntner,
Plaintiffs-Appellees,

v.

**FEDERAL SAVINGS AND LOAN IN-
SURANCE CORPORATION,**
Defendant-Appellant.

No. 16485.

United States Court of Appeals
Seventh Circuit.

June 7, 1968.

Rehearing Denied July 2, 1968.

David J. Shipman, John F. McCarthy, Chicago, Ill. (Max Wilfand, Asst. General Counsel, William Sullivan, Attorney,

Federal Home Loan Bank Board, Washington, D. C., of counsel), for appellant.

James B. Sloan, Chicago, Ill., for appellees.

Before KNOCH, Senior Circuit Judge, and SWYGERT and CUMMINGS, Circuit Judges.

CUMMINGS, Circuit Judge.

Plaintiffs sued for a declaratory judgment that the Federal Savings and Loan Insurance Corporation ("Insurance Corporation") has no title to a $50,000 account on deposit in the National Boulevard Bank of Chicago.[1] The Insurance Corporation is a corporate instrumentality and agency of the United States, organized under Subchapter IV of the National Housing Act (12 U.S.C. § 1725 et seq.).

Plaintiffs were the president and secretary of the First Federal Savings and Loan Association of Morton Grove, Illinois ("First Federal"), which was chartered on August 1, 1959, by the Federal Home Bank ("Loan Bank"), which is an agency of the United States charged with the responsibility of chartering, regulating and insuring federal savings and loan associations. It manages and supervises the Insurance Corporation. As a condition for the issuance of First Federal's charter and for the insurance of its accounts by the Insurance Corporation, the Loan Bank exacted a pledge of First Federal savings share accounts in the sum of $50,000 as a guarantee by the pledgors to First Federal against losses. Accordingly, 12 share accounts were pledged to the Federal Home Loan Bank of Chicago. Eight of these accounts were of organizers, directors and officers of First Federal. Plaintiffs were among the pledgors and are suing for themselves and the other remaining pledgors.

In September 1960, the pledgors executed a Pledge and Escrow Agreement effective August 1, 1959, the date of the issuance of First Federal's charter. The pledgors assigned and delivered their $50,000 First Federal shares in escrow to the Federal Home Loan Bank of Chicago for five years. In pertinent part the Merger and Escrow Agreement provided that whenever the Loan Bank should find any impairment in First Federal's capital, it would direct the Federal Home Loan Bank of Chicago to deliver the pledged shares to First Federal for cancellation and transfer upon its books of the dollar amount of credits represented by the cancelled shares to the reserves of First Federal for the purpose of absorbing its losses or operating deficits. The Pledge and Escrow Agreement contained the following refund clause upon which plaintiffs rely:

"If during the life of this agreement there shall have been any charges against the share accounts herein pledged, the said association shall, whenever possible after the termination of this agreement, refund such amounts on a pro rata basis to the pledgors; provided, however, that no refund to any pledgor shall exceed the amount such pledgor has been required to forfeit by reason of the terms of this agreement; and provided, further, that no such refund shall be made when the said association's net reserves for losses and surplus would thereby be reduced to less than 3% of its net assets."

The Pledge and Escrow Agreement also provided that the pledged shares were to be delivered by the Federal Home Loan Bank of Chicago to First Federal for like cancellation and transfer in the event of First Federal's liquidation.

In May 1964, plaintiffs and other directors of First Federal advised the Federal Home Loan Bank of Chicago as follows:

"The audit of the Association reveals that the Association will be minus $47,000.00 in meeting its June 30, 1964 dividend of 4¼%. The survey of de-

---

1. This $50,000 account has been augmented by $5,557.26 in dividends or interest, but only the ownership of the $50,000 originally pledged by the plaintiffs and their associates is at issue.

linquencies reveals a potential loss of $174,000.00 upon bad loans (see attached). Reserves at present are at $72,000.00."

On June 8, 1964, the First Federal directors adopted a resolution consenting to the appointment of a conservator.

On June 15th, the Loan Bank rejected alternative proposals submitted by First Federal with respect to its future operations and appointed Clarence M. Christie as its conservator, effective June 27, 1964, on grounds of its insolvency, violation of law or regulation, and unsafe or unsound operation.

On June 18th, First Federal's directors adopted another resolution, acknowledging that the Loan Bank had expressed its intention to levy against the $50,000 pledged saving share accounts and authorizing plaintiffs to withdraw $50,000 as co-trustees for the pledgors, to hold said amount in escrow "pending final determination of the status of the accounts." On the same date, plaintiff Reiter drew a First Federal $50,000 check payable from the general funds of the Association on deposit at the LaSalle National Bank of Chicago, payable to the plaintiffs as co-trustees. The proceeds of the check were ultimately deposited in their trust account at the National Boulevard Bank of Chicago. No charge was made against the individual pledged share accounts; no change was made in the ledger accounts or cards representing those accounts; and the passbooks remained in the possession of the Federal Home Loan Bank of Chicago. The $50,000 trust account was shown on First Federal's books as an asset under "Accounts Receivable" and later under "Account in Escrow."

On June 23, 1964, the Loan Bank wrote the Federal Home Loan Bank of Chicago that there was an impairment in the capital of First Federal. Accordingly, the Federal Home Loan Bank of Chicago was directed to deliver the $50,000 pledged share accounts to First Federal for cancellation, with instructions that the dollar amount of the credits repre-

sented by the pledged shares be transferred upon First Federal's books to its reserves for the purpose of absorbing losses. The conservator took charge of First Federal on June 27, 1964, and thereupon carried out the cancellation and transfer instructions. After reflecting the $50,000 charge in the pledged passbooks, he returned them to the pledgors on the same date.

Also on June 27, the conservator entered into a Sale and Purchase Agreement with the Insurance Corporation. In order to prevent a default by First Federal, the Insurance Corporation agreed to purchase certain First Federal assets, thus facilitating a merger between First Federal and the successful Second Federal Savings and Loan Association of Chicago ("Second Federal"). Pursuant to this agreement, the Insurance Corporation paid $2,800,000 for various distressed and doubtful assets of First Federal and assumed all its undisclosed liabilities. The agreement was to terminate unless First Federal and Second Federal should merge within 30 days therefrom.

Again on June 27, First Federal's conservator entered into a Plan of Merger and Merger Agreement with Second Federal, which was to become the resulting association. Second Federal's charter was made the charter of the resulting association, and First Federal's charter was surrendered for cancellation. The Merger Agreement provided that the resulting association was to be a continuation of Second Federal. All First Federal's assets, including those arising under the Sale and Purchase Agreement between First Federal and the Insurance Corporation, were vested in Second Federal, and all First Federal's saving share accounts were transferred to Second Federal. The Merger Agreement also provided that the resulting association would assume all liabilities of First Federal.

On July 16, 1964, Second Federal assigned to the Insurance Corporation all of Second Federal's rights in the $50,000

in dispute. In return, the Insurance Corporation paid Second Federal $50,000.

A payment of $50,000, the amount of the pledged share accounts, by Second Federal to plaintiffs would not reduce its net reserves to less than 3% of its net assets, and the District Court held that under the above-quoted refund clause of the Pledge and Escrow Agreement, Second Federal was obligated to refund that amount to plaintiffs. The Court held that this obligation passed to the Insurance Corporation and that it was accordingly without any interest in the $50,000 on deposit at the National Boulevard Bank of Chicago. Summary judgment was entered for plaintiffs.

By way of dictum, the District Court found "very persuasive" an argument of the plaintiffs that although the June 1964 transfer of these funds to them may have violated the Pledge and Escrow Agreement, the only legal consequence would be the revocation of First Federal's charter. However, the summary judgment for plaintiffs was entered on an alternative ground. Thus the Court held the aforesaid refund clause of the Pledge and Escrow Agreement was applicable, stating "I am in full agreement with the plaintiffs that the duty of the defendant's assignor, Second Federal, to reimburse the plaintiff [under that clause] is a complete defense against any rights to the funds that the defendant might have."

We cannot agree with either ground and therefore reverse.

On June 8, 1964, First Federal's directors consented to the appointment of a conservator. Ten days later, knowing of First Federal's desperate position, five of its directors, having previously pledged their First Federal share accounts to the Federal Home Loan Bank of Chicago, voted to disburse the funds represented by all the pledged accounts to plaintiffs

as co-trustees. On the same day, plaintiffs withdrew $50,000 from the First Federal's general checking account at the LaSalle National Bank and deposited it in another bank, and later at the National Boulevard Bank of Chicago. Plaintiffs were of course not entitled to withdraw general funds of First Federal for their own benefit. No change was made in the First Federal's ledger accounts or cards representing the pledged share accounts, the passbooks remained in the hands of the Federal Home Loan Bank of Chicago, and First Federal continued to show the withdrawn sum as an asset. Therefore it would appear that the withdrawal was from its general funds.[2] First Federal had the right to those funds. This right passed to Second Federal under the Merger Agreement and in turn to the Insurance Corporation by assignment. Therefore, plaintiffs have no interest in the funds unless they acquired a right of reimbursement under the refund clause of the Pledge and Escrow Agreement.

Under the impairment in capital clause in the Pledge and Escrow Agreement, the Loan Bank directed the pledgee Federal Home Loan Bank of Chicago to deliver the pledged shares to First Federal for cancellation, with the amount of credits represented by these shares transferred to reserves on First Federal books. This was done by First Federal's conservator on June 27, 1964, when he charged the pledged accounts in the amounts pledged, thereafter returning the passbooks to the pledgors.

The refund clause in question required First Federal to refund the pledged amounts to the pledgors "whenever possible" after the August 1, 1964, termination of the Pledge and Escrow Agreement, provided that no refund should be made when First Federal's net reserves would be reduced to less than 3% of its net assets.

2. If the withdrawal was from the pledged share accounts as plaintiffs contend, it was still illegal, for only the Loan Bank could release these accounts from the terms of the Pledge and Escrow Agreement, and it did not do so. Instead, the Loan Bank caused this amount to be transferred to First Federal's reserves. This asset passed to Second Federal upon the merger with First Federal and was later assigned to Insurance Corporation.

Concededly, the refund of these pledged accounts would have reduced First Federal's net reserves to less than 3% of its net assets. If First Federal's operations eventually had resulted in the accumulation of adequate reserves, the refund clause would clearly have applied to plaintiffs and the other pledgors. But it is plain that the refund clause was conditioned on First Federal's acquisition by its own devices of adequate capital reserves and not to this situation where the Insurance Corporation had to purchase $2,800,000 of doubtful assets of First Federal and to assume all its undisclosed liabilities. It was only this intervention of the Insurance Corporation that made possible the "merger" of First Federal into Second Federal. Under the Merger Agreement the new association was expressly "a continuation of the entity and identity of Second Federal" and the charter of First Federal was cancelled. There was no longer a First Federal as contemplated by the refund clause in question. In our view, the refund clause was not meant to apply after the failure of First Federal but required the continuation of business on its part. Cf. International Co. of St. Louis v. Sloan, 114 F.2d 326, 329 (10th Cir. 1940), certiorari denied, 311 U.S. 702, 61 S.Ct. 142, 85 L.Ed. 45. It is true that under the Merger Agreement Second Federal assumed the pre-existing liabilities of First Federal. However, First Federal was not under any obligation to refund the $50,000, for its reserves would thereby have been reduced to less than 3% of its net assets. Consequently, Second Federal's assumption of First Federal's liabilities did not require Second Federal to refund the $50,000 to plaintiffs and the other pledgors.

Looking at substance, First Federal had failed and was in effect liquidated.

Plaintiffs can point to no clause in the Pledge and Escrow Agreement that would entitle them to a refund in the event of liquidation.[3] The refund clause in question would not apply by its very terms, for First Federal was no longer *in esse* in any form.

Our conclusion that the refund clause is inapplicable is consistent with the purpose of the Pledge and Escrow Agreement. To induce the insuring of First Federal's accounts and the issuance of a charter, these pledges were required to provide a cushion against First Federal's failure and to encourage First Federal's organizers to work for its success. As a result of that failure, defendant was forced to advance $2,800,000 to persuade Second Federal to take over First Federal's insured deposit share accounts. Even the small cushion provided by the pledges would be lost if the refund clause were held to apply. Of course, the additional purpose of the cushion to encourage the best efforts of First Federal's organizers was inapplicable after Second Federal took over.

In sum, we hold only that the refund clause does not cover the circumstances of this case. Mergers are not mentioned in the Pledge and Escrow Agreement, and we need express no opinion whether the refund clause would apply to mergers of viable associations.

Plaintiffs finally argue that their pledges were invalid as beyond the authority of the Loan Bank. Section 1726(b) of the National Housing Act (12 U.S.C. § 1726(b)) requires insured institutions to provide adequate reserves. Consistently therewith, the regulations, which are a permissible exercise of the power conferred on the Loan Bank by Section 5(a) of the Home Owners' Loan Act (12 U.S.C. § 1464(a)), permit the Loan Bank to prescribe whatever "re-

3. Defendant did not urge below that First Federal had been liquidated. Nevertheless, it did assert that the refund clause was only operative if First Federal remained in existence and improved its financial position. There is no need to remand for consideration of the liquida-

tion point, for this Court can appropriately construe the Pledge and Escrow Agreement. United States v. General Motors Corp., 384 U.S. 127, 141, note 16, 86 S.Ct. 1321, 16 L.Ed.2d 415; Best Medium Co. v. National Insider, Inc., 385 F.2d 384, 386 (7th Cir. 1967).

quirements as it deems necessary or desirable" (12 C.F.R. § 543.2(d)). These provisions empowered the Loan Bank to exact the $50,000 pledged as a guaranty against losses. The fact that insured share accounts were pledged does not bar defendant's claim. A pledgor cannot recover insurance on an insured item forfeited under the provisions of a consensual pledge. Other points raised by plaintiffs have been considered but are not persuasive.

The judgment is reversed, with direction to award defendant the deposit in controversy.