**INTERMAR, INC., t/a Super Sonic Car Wash**

**v.**

**ATLANTIC RICHFIELD COMPANY.**

**Civ. A. No. CA 73-1397.**

United States District Court,
E. D. Pennsylvania.

Aug. 9, 1973.

Daniel B. Berkson, Philadelphia, Pa., for plaintiff.

Robert M. Landis, Dechert, Price & Rhoads, Philadelphia, Pa., for defendant.

## FINDINGS OF FACT, CONCLUSIONS OF LAW AND DISCUSSION

TROUTMAN, District Judge.

### Introduction

On Friday, June 22, 1973, the plaintiff, the owner and operator of a retail gasoline station in the City of Philadelphia, filed with this Court its complaint and ex parte motion for a temporary restraining order and preliminary injunction, seeking to compel the defendant, a manufacturer and distributor of petroleum products, to forthwith deliver to plaintiff needed supplies of gasoline motor fuel to assure plaintiff's continued operation of its retail gasoline distributorship located at 80th and Ogontz Avenue in the City of Philadelphia. The defendant, upon contact by the Court, agreed to supply the plaintiff's gasoline needs at said station through Tuesday, June 26, 1973, thus eliminating the need for a temporary restraining order. Hearing was fixed for Wednesday, June 27, 1973, the earliest date reasonably convenient to the parties and the Court. Commencing June 27, 1973, the matter was heard through July 9, 1973.

In its complaint, the plaintiff alleged that the defendant, on or about May 25, 1973:

1. Combined or conspired with one or more of its lessee dealers (in the counties of Philadelphia, Bucks, Chester, Delaware and Montgomery—the "Philadelphia Metropolitan Area")—to suppress ARCO's large volume price discounting independent dealers in the area, including plaintiff, as effective competitors of its lessee dealers, in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1 et seq. (First Count of the Complaint);

2. Combined or conspired with one or more of its lessee dealers in the Philadelphia metropolitan area to raise, regulate or stabilize the prices charged the public for gasoline by its lessee dealers and its large volume price discounting independent dealers, including plaintiff, in the area, in violation of Section 1 of the Sherman Act, *supra* (First Count of the Complaint);

3. Committed a material breach of the "Contract Dealer Agreement" between plaintiff and defendant entered into on June 30, 1972, by failing to adhere to then general practice or to sustain a course of performance upon which plaintiff had come to rely to continue its discount gasoline business. (Fourth Count of the Complaint);

4. Discriminated against plaintiff in the allocation of gasoline to it commencing June 1, 1973, by favoring its lessee dealers at the expense of plaintiff, in that defendant failed to allocate gasoline to all of its dealers in the Philadelphia metropolitan area in a "fair and reasonable manner", but substantially reduced supplies of gasoline to plaintiff and defendant's other large volume price discounting independent dealers in the area while continuing to provide, as customary, supplies of gasoline to its lessee-dealers, in violation of §§ 1–203 and 2–615 of the Uniform Commercial Code, 12A P.S. § 1—203 and § 2—615 and in violation of the Common Law (Second Count of the Complaint).

5. Made representations to plaintiff to supply it with all plaintiff's gasoline requirements during a five-year period ending August 31, 1977, to induce plaintiff to build and expand its facilities, plaintiff relied on such representations; and, therefore, defendant is estopped from avoiding the effect of said representations. (Third Count of the Complaint)

Extended testimony and evidence was produced by the plaintiff throughout eight days of testimony, some of which consisted of the testimony of defendant's officials, which witnesses were produced by the defendant on extremely short notice in an effort to provide the Court with relevant information. Counsel have fully cooperated with the Court in reviewing the record, submitting suggested findings and conclusions and supporting memoranda.

Before the Court is defendant's motion to dismiss the plaintiff's complaint and plaintiff's application for a preliminary injunction as to which the Court makes the following

## FINDINGS OF FACT

### I.

### *The parties*

1. Plaintiff, Intermar, Inc., is a Pennsylvania corporation with its main office at 130 W. Lancaster Avenue, Wayne, Pennsylvania.

2. Plaintiff owns and operates a retail gasoline station, with a car wash facility and a retail tire sales center, trading as Super Sonic Car Wash at 80th and Ogontz Avenues in Philadelphia, Pennsylvania, ("80th and Ogontz"), (Exhibits P–1 and P–2); at Castor Avenue and Van Kirk Street, Philadelphia, Pennsylvania, ("Castor and Van Kirk"); and at Germantown Avenue and DeKalb Street, Norristown, Pennsylvania, ("Norristown").

3. Plaintiff leases from ARCO and operates a retail gasoline station at Lancaster and Ardmore Avenues in Ardmore, Pennsylvania.

4. In addition, plaintiff maintains ten other retail gasoline stations in the Philadelphia and suburban areas under arrangements with oil companies other than ARCO.

5. Defendant is Atlantic Richfield Company ("Atlantic" or "ARCO"), a Pennsylvania corporation doing business at 260 S. Broad Street, Philadelphia, Pennsylvania, which is engaged in the manufacture of petroleum products and the sale of such products to wholesale distributors, retail distributors and consumers.

6. ARCO is a supplier of petroleum products, selling such products to wholesale distributors, to service station dealers and to commercial customers. Some service station dealer customers of ARCO operate on premises leased to them by ARCO ("Lessee-dealers") and some operate on premises owned by the dealer or leased to the dealer by someone other than ARCO ("Contract Dealers" sometimes referred to herein as "Independent Dealers").

7. EASTCO, Inc. ("EASTCO") is a subsidiary of ARCO.

8. EASTCO operates self-service stations marketing ARCO gasoline at four (4) locations in the Philadelphia area.

9. Atlantic sells gasoline motor fuel to Intermar under certain written contractual arrangements, known as Contract Dealer Agreements, at three locations operated by Intermar in the Philadelphia area: 80th & Ogontz Avenues, Philadelphia; Castor and Van Kirk Streets, Philadelphia; and 10 E. Germantown Pike, Norristown, Pennsylvania.

## II.

*The structure of gasoline marketing by ARCO in Philadelphia and its adjoining suburban area*

10. ARCO also sells gasoline to 691 retail gasoline stations in the Philadelphia and Philadelphia suburban districts.

11. Of the 691 retail gasoline stations supplied gasoline by ARCO, 393 are owned by ARCO.

12. Of the 393 retail gasoline stations owned by ARCO, 389 are leased to persons other than EASTCO who are known as "lessee-dealers" and 4 are leased by EASTCO.

13. There are 298 retail gasoline stations supplied gasoline by ARCO which stations are not owned by ARCO. The operators of these stations are known as "independent dealers" or "contract dealers".

14. There are 374 ARCO retail gasoline stations in ARCO's Philadelphia dis-

trict. Of these, 210 are lessee-dealers and 164 are independent dealers.

15. ARCO supplies gasoline in bulk to its lessee-dealers and its contract dealers, at the same price, which price is known as the "tank-wagon" price.

16. Based on the record before us, "very few" of the contract dealers and none of the lessee-dealers in the Philadelphia district discount the price of gasoline sold to the consumer.

17. Specifically, lessee-dealers pay a rental charge to ARCO in addition to the tank-wagon price of approximately 1.75 cents per gallon for the first 35,000 gallons purchased during a calendar month. For gasoline purchased in excess of 35,000 gallons, the rental charge is something less than 1.75 cents per gallon.

18. 80th and Ogontz and other contract dealers, pay to ARCO the tank-wagon price per gallon of gasoline. They each receive from ARCO payment of 1.5 or more cents for each gallon of gasoline purchased. This payment is known as the "effective discount".

19. The effective discount at 80th and Ogontz is 1.5 cents per gallon. (Exhibit P–2)

## III.

*The contract dealer agreements between ARCO and plaintiff*

20. On June 30, 1972, Intermar made certain written agreements with Atlantic, effective September 1, 1972, for its 80th & Ogontz location. On June 30, 1972, Intermar made certain written agreements, effective July 1, 1972, for its Norristown location. On July 12, 1972, Intermar made certain written agreements with Atlantic, effective July 1, 1972, for its Castor and Van Kirk location.

21. The general provisions of these agreements were similar although there were specific terms as to monetary payments, gallonage to be bought and sold and the duration which varied at the different locations. In general, the

agreements provided for an initial payment in the form of a loan by Atlantic to Intermar, referred to as "front money", for quarterly monetary payments by Atlantic to Intermar during the terms of the agreement, and for the purchase by Intermar from Atlantic of certain specific gallonage requirements.

22. The agreement between Intermar and Atlantic for the 80th & Ogontz location was for a term of September 1, 1972, to August 31, 1977, or until 6,000,000 gallons of motor fuel are delivered to Intermar whichever occurs last (Paragraph 3, Contract Dealer Agreement, Exhibit P–1). The agreement further provided that Intermar would purchase not less than 840,000 gallons of motor fuel annually and Intermar would not be required to purchase and Atlantic would not be required to deliver more than 1/8 of the annual gallonage in any one month. The agreement provided that "the times, manner and quantities of deliveries shall be in accordance with Atlantic's current practice in effect from time to time". (Paragraph 4, Contract Dealer Agreement, Exhibit P–1).

23. Prior to May 25, 1973, ARCO supplied gasoline to retail gasoline stations in the quantities which were ordered and/or required by all retail gasoline stations.

24. The agreement further provided that "neither party shall be in default if unable to fulfill an obligation under [the] agreement by reason of * * * compliance with any government order, requisition or request * * * ". (Paragraph 9, Contract Dealer Agreement, Exhibit P–1).

25. The agreement provided that it "constitutes the entire understanding of the parties and may not be changed except·by a written agreement executed by both parties". (Paragraph 12, Contract Dealer Agreement, Exhibit P–1).

26. The "front money"· agreement between Intermar and Atlantic for the 80th & Ogontz location (Exhibit D–1) provided for a loan to Intermar of $89,250.00 for improvements to ·Intermar's premises to be repaid in four annual installments of $22,312.50 each and provided further that each installment would be forgiven and absolutely discharged on the due date if, at that time, Intermar had fully complied with its obligations under the Contract Dealer Agreement.

27. Intermar and Atlantic also entered into a written agreement for the 80th and Ogontz location providing for quarterly payments by Atlantic to Intermar beginning on June 1, 1973, in the amount of $4,500.00 for the duration of the Contract Dealer Agreement so long as Intermar continued to fulfill its obligations under the Contract Dealer Agreement. (Exhibit P–2).

28. The terms of the agreements logically influenced Intermar in entering into the Contract Dealer Agreement with Atlantic for its 80th & Ogontz location.

29. The agreements between Intermar and Atlantic for the Castor Avenue and Van Kirk and Norristown locations provided for annual gallonage at each of those locations of 420,000, total gallonage for the term of the agreements of 3,000,000 gallons at each of those locations, "front money" loans of $44,250.00 by Atlantic to Intermar for each of those locations, and quarterly payments of $2,250.00 by Atlantic to Intermar for the duration of each of those agreements.

30. Under these agreements there was no legal obligation upon Atlantic to supply all of Intermar's needs for gasoline motor fuel without limitation or any representation that Atlantic would supply to Intermar all of the gasoline that Intermar could sell.

31. During the summer and fall of 1972, ARCO entered into new contract dealer relationships involving various retail gasoline stations.

32. As we have previously noted, prior to May 25, 1973, ARCO supplied gasoline to retail gasoline stations in the quantities which were ordered and/or required by all retail gasoline stations.

33. The marketing concept at 80th and Ogontz was to remain open for business 24 hours per day; seven days per week; to sell gasoline well below the price charged by other retail gasoline stations in the adjacent area; to offer tires for sale and a car wash facility at the station; and to offer no relationship in pricing among the sale of gasoline and the tire sales or the car wash.

34. ARCO may have known of 80th and Ogontz's intended and actual method of operation prior to entering into the contract.

35. At the Castor and VanKirk and Norristown stations the marketing concept is to limit the hours of operation and days of operation to appropriate weather conditions and charge for gasoline at or above that being charged by other retail gasoline stations in the area adjacent to it and to offer a free car wash with the purchase of a certain amount of gasoline.

36. EASTCO's marketing concept is to offer a self-service operation to reduce labor and other costs, and thereby lower the price of gasoline to increase the volume of gasoline sold.

37. There are five (5) ARCO lessee-dealers within one and one-half miles of 80th and Ogontz, which are located at and identified as:

68th and Ogontz
Cheltenham and Wadsworth
Ogontz and Washington
Cheltenham and Pittville
Oak Lane and Cheltenham.

38. From the time 80th and Ogontz began in operation until June, 1973, the price of gasoline charged by it was below the price of gasoline charged by the ARCO lessee-dealers located within one and one-half miles of it.

39. From the first full month 80th and Ogontz began in operation until June, 1973, more gasoline was sold by it than any other ARCO lessee-dealer located within one and one-half miles of it. (Exhibits P–11, P–18).

40. For the month of May, 1973, no ARCO retail gasoline station within ARCO's Eastern Pennsylvania Region sold as much gasoline as 80th and Ogontz.

41. As a new retail gasoline station, which sold ARCO gasoline, 24 hours per day, seven (7) days per week, at a price below that charged by the ARCO dealer-lessees within one and one-half miles of it, 80th and Ogontz presumably diverted potential customers from these ARCO dealer-lessees to itself, from October 1972 until June, 1973. (Exhibit P–18).

42. ARCO has a suggested retail price in the Philadelphia and suburban Philadelphia area.

43. Intermar, at 80th & Ogontz, and the other contract dealers sold gasoline below the suggested price.

44. In June 1973, ARCO had available for sale less than 94% of the actual sales for June 1972.

## IV.

### The evidence on competition with lessee-dealers

45. The underlying theory of Intermar's allegation of conspiracy between Atlantic and its lessee-dealers was that the lessee-dealers were suffering from the competition by Intermar and other so-called independent price-cutting contract dealers and that the allocation program was a response to lessee-dealer complaints about such competition and was established in furtherance of this conspiracy.

46. The evidence offered by Intermar on competition with its location at 80th & Ogontz Avenues was that the competition was localized in the immediate geographical area of that location with other lessee-dealers of Atlantic. (See Exhibit P–11).

47. Although the written agreements admitted into evidence established that a lessee station owned by Atlantic was operated by Baker, Intermar's president,

under an agreement made on April 18, 1973, Intermar contended that the gasoline allocation to that location established a disparity in favor of lessee operators compared with contract dealers. There is no evidence to support this contention. Baker was allowed a June allocation for this location of 1/12 of the estimated yearly consumption for the location since Baker was a new customer of Atlantic at this location and, in addition, Atlantic's right of possession at the location was in litigation in the Common Pleas Court of Montgomery County (Exhibit P–4). The evidence establishes that the same principle of allocation for new customers of 1/12 of the estimated yearly consumption was applied to Baker's operation in Ardmore as Atlantic applied to other new customers under its gasoline control program for the eastern marketing area.

## V.

### *The development of ARCO's gasoline allocation program*

48. Atlantic determined its gasoline supply available for marketing in its marketing area east of the Rocky Mountains by maintaining a monthly volume balance procedure, with weekly inventory reports, and projecting a supply capability against a minimum basic inventory which has to be preserved to keep the supply system operational.

49. The basic minimum inventory that has to be retained in the system for the marketing area east of the Rocky Mountains is 6,500,000 barrels of gasoline which is in the tank bottoms, pipelines and carriers between the refineries and the distribution system. This basic minimum inventory is not available for marketing.

50. For June, 1973, there was available for sale in the marketing area east of the Rocky Mountains 6,639,000 barrels of gasoline, and the sales of gasoline in May, 1973, were approximately 7,500,000 barrels, which exceeded by a million barrels the originally projected sales for May.

51. The heaviest gasoline consumption months are July and August and the projection of supplies for those months must take into account the retention of the basic minimum inventory in the system for September of 6,500,000 barrels, as well as providing for supplies for the months of July and August.

52. Around May 10, 1973, Secretary Simon of the Office of Oil and Gas of the United States Department of the Interior announced a voluntary allocation program for gasoline supplies which was later published in the Federal Register on May 23, 1973, 38 Federal Register No. 99.

53. On May 14, 1973, Wagner, Manager of ARCO's Coordination and Supply Department for the area east of the Rocky Mountains, recommended to ARCO that on June 1, 1973, a control procedure be adopted on gasoline east of the Rockies.

54. On or about May 25, 1973, ARCO sent to each retail gasoline station east of the Rockies a letter stating the following:

"Because of the limited quantity of available gasoline supplies, Atlantic Richfield has found it necessary to limit sales of gasoline to its customers in its marketing territory East of the Rocky Mountains, beginning with sales for month of June, 1973.

"Until further notice, our sales of gasoline to you beginning June 1, 1973, will be limited to (104%) of our sales to you during the comparable calendar month of 1972, except in those cases where a different basis is approved due to such factors as the lack of 1972 sales history or the occurrence of a material intervening event. Any amount available to you in any month cannot be carried over to the succeeding month.

"If you have any questions concerning the foregoing, please get in touch with your Atlantic Richfield Sales Representative or your local delivery point."

(Exhibit P–3)

55. The May 25, 1973, letter was the first notification of any kind to retail gasoline outlets.

56. ARCO's interpretation of the letter announcing limitation of sales to 104% of the sales during the comparable calendar month of 1972, except where a different basis is approved due to such factors as the lack of 1972 sales history or the occurrence of a material intervening event is in part contained in the document called the "Eastern Area Gasoline Control Program". (Exhibit P–21)

57. The "Eastern Area Gasoline Control Program" provides that where a contract dealer has no comparable sales history the control percentage of the EYC divided by twelve (12) is applied.

58. The "Eastern Area Gasoline Control Program" provides:

"In the event a base month is determined to have been adversely affected by a natural and non-recurring event (e. g., traffic disruption, reconstruction, temporary closure, etc.), Region or Zone Managers may approve an alternate basis which shall be an average of the nearest preceding and successive full month on each side of the period of interruption."

(Exhibit P–21)

59. The "Eastern Area Gasoline Control Program" provides:

"All other claimed exceptions hardships shall be referred to area managers for review * * *."

60. The "Eastern Area Gasoline Control Program" provides:

"In all dealer changes since May 1, 1972, where there is no EYC, an optional basis may be used consisting of an average of fourth quarter gallons for 1972." (Exhibit P–21)

There was an EYC for plaintiff's stations.

61. Since 80th and Ogontz was not in operation during June, 1972, the EYC divided by 12 multiplied by the control percentage of 104 was the formula used to allocate gasoline to 80th and Ogontz.

62. Atlantic's allocation program for gasoline supplies effective on June 1, 1973, was developed in response to a government request and in recognition of the fact that May sales had exceeded the projected figures and that, with its refineries operating at full capacity, a control figure for June, 1973 had to be established at 6,639,000 barrels of gasoline in order to preserve the basic minimum inventory in September and to provide supplies for July and August. Upon the recommendation of the manager of the Coordination and Supply Department for Atlantic, this control figure was established at Atlantic's headquarters in Los Angeles for June, 1973, for the area east of the Rocky Mountains, as the amount of gasoline available for marketing in that marketing area.

63. In the absence of a 1972 sales history or the occurrence of a material intervening event, such as the replacement by a new customer of an old one at an existing location, Atlantic established an allocation of $\frac{1}{12}$ of the estimated yearly consumption (EYC) for that location.

64. The estimated yearly consumption is a figure calculated by Atlantic for a particular location at the time a contract dealership is established or a station is constructed or rebuilt by Atlantic at the particular location. The EYC is based on traffic studies, market research and proposed methods of operation and is established by Atlantic's marketing research department, taking into account information received from the operator.

65. Among the factors considered as material intervening events under the allocation program were reconstruction and replacement of existing facilities, major traffic interruptions caused by highway construction, and the occurrence of natural disasters such as Hurricane Agnes over which the operator had no control.

66. The basic principle to determine the allocation figure allowed to all Atlantic dealers beginning on June 1, 1973,

was that they would be allowed 104% of Atlantic's sales to them during the corresponding calendar month of 1972, except where there was an absence of a corresponding sales history or the occurrence of a material intervening event.

67. The evidence establishes that under Atlantic's eastern area gasoline control program, the identical class of trade control basis was used for lessee-dealers, for contract dealers, and commercial accounts. (Exhibit P–21)

*The effect of the allocation program on Intermar and other dealers*

68. Since Intermar had no sales history with Atlantic for June, 1972, for its operations at 80th & Ogontz, Philadelphia, Castor and VanKirk, Philadelphia, and East Germantown Pike, Norristown, the allocation for June at these locations was 1/12 of the estimated yearly consumption for each of them, just as it was applied for other contract dealers and lessee-dealers.

69. The June allocation for Intermar's location at 80th & Ogontz was 104,000 gallons, for its location at Castor and VanKirk was 52,000 gallons, and for its location at Norristown was 52,000 gallons. The sales in May, 1973 for 80th and Ogontz were 356,060 gallons, for Castor and VanKirk were 23,253 gallons and for Norristown were 30,593 gallons.

70. Intermar used more than its June allocation at 80th & Ogontz and substantially less than its June allocation at Castor and VanKirk and Norristown, respectively.

71. At 80th and Ogontz, as a result of the curtailment in supplies of gasoline in June, 1973, the station has reduced its hours of operation from 24 hours per day and seven days per week to 9 o'clock A.M. to 6 o'clock P.M. per day, closed Sundays.

72. At 80th and Ogontz, as a result of the curtailment in supplies of gasoline in June, 1973, the station has reduced its number of employees.

73. At 80th and Ogontz, as a result of the curtailment in supplies of gasoline in June, 1973, the station ran out of gasoline at 5:30 o'clock P.M. Friday, June 22, 1973. Pending hearing, defendant voluntarily made supplies available through June 26, 1973.

74. At 80th and Ogontz, the station raised the price it charged the public for gasoline in June, 1973.

75. At the same time, June, 1973, ARCO's lessee-dealers in the immediate area experienced no curtailment in gasoline or reduction in supplies of gasoline and have offered promotions of glassware and stamps, nor did Intermar experience a curtailment in gasoline supplies from ARCO except at 80th and Ogontz.

76. However, the evidence establishes that of all the lessee-dealers and contract dealers in Atlantic's Philadelphia suburban district, approximately 68, had exhausted their June allocation by the end of June, 1973, and that approximately half of these were lessee-dealers and half were contract dealers.

77. The EASTCO operation at Trooper, which was totally rebuilt on the existing location as a self-service operation, received an allocation for June, 1973, based on 1/12 of its EYC. That allocation was 78,000 gallons compared with May sales of 127,150 gallons.

## VI.

*The interest of the public in preserving a competitive retail gasoline market*

78. The public has a definite interest in preserving a competitive retail gasoline market.

## VII.

*The effect on interstate commerce*

79. ARCO's production, the refining and supplying of gasoline, affects interstate commerce.

80. ARCO's Gasoline Control Program for the area of the United States east of the Rocky Mountains affects interstate commerce. (Exhibit P–21).

81. ARCO's production of crude oil which is used to refine and produce gasoline takes place outside the Commonwealth of Pennsylvania.

## VIII.

### *The effect of the allocation program of the Office of Oil and Gas of the Department of the Interior*

82. Under 38 Federal Register No. 99, the Office of Oil and Gas of the United States Department of the Interior was authorized to administer an allocation program for crude oil and refinery products throughout the United States. This program, established under the provisions of the Economic Stabilization Act of 1970, effective May 21, 1973, created priority categories to meet fuel needs and established administrative procedures for customers of suppliers of petroleum products to obtain needed supplies and to hear complaints of those who believe they are not receiving a proper allocation under the guidelines of the program. The regulation provides for the national coordination of the allocation program and prescribes that the national program shall preempt any of the states from intruding to disrupt the uniformity of the program and its "smooth and equitable functioning".

83. As provided in the regulation, the Office of Oil and Gas is authorized under the allocation program to "impose a mandatory allocation on a supplier" if, after hearing, it verifies the accuracy of a complaint against the supplier.

84. Intermar has not applied to the Office of Oil and Gas for a mandatory allocation of gasoline from Atlantic.

85. The essence of Intermar's complaint in this case and the object of its request for mandatory relief to this Court is that it should be provided with an adequate supply of gasoline by Atlantic for its 80th and Ogontz location. This is the same kind of relief which may be obtained under the procedures of the government allocation program through the Office of Oil and Gas as

provided in the regulation establishing this allocation program.

## IX.

### *Evidence on irreparable harm*

86. An essential element of the burden of proof upon a plaintiff who seeks a preliminary injunction is evidence that it suffers impending harm which cannot be compensated in monetary damages. Intermar has not met its burden of proof on this critical element in this preliminary injunction hearing.

87. Intermar's president, Baker, testified that the effect of the reduction of its gasoline supplies at its 80th and Ogontz location would be to produce a minimal profit.

88. Moreover, the evidence before the Court establishes that Intermar's operations serviced by Atlantic at Castor and VanKirk and East Germantown Pike in Norristown have continued to receive ample supplies under Atlantic's allocation program, supplies which those locations have not consumed under their June allocation.

89. There is no credible evidence and the weight of the testimony does not establish that the allocation program was established because of the activities of Intermar or other so-called independent dealers in the Philadelphia area or pursuant to any conspiracy or combination between Atlantic or any of its lessee-dealers or between Atlantic or any of its subsidiaries or that its purpose was to regulate or stabilize prices of Atlantic's gasoline.

90. The evidence also establishes that under all of the circumstances surrounding the administration of Atlantic's allocation program in the broad marketing area in which it was applied, the program was uniformly and fairly applied and operated without discrimination among contract dealers, lessee-dealers, or locations operated by EASTCO. (Exhibit P–18)

91. There is no credible evidence and the weight of the evidence does not es-

tablish that Atlantic acted discriminatorily or unfairly toward Intermar in establishing its gasoline allocations for Intermar's locations.

92. The evidence does not establish that Intermar has suffered or will suffer irreparable harm from the application of the Atlantic allocation program or from the denial of its motion for a preliminary injunction.

93. There is, on the record before us, absent discovery and the full presentation of plaintiff's case, a lack of reasonable probability that Intermar will prevail on the merits of its complaint against Atlantic.

## DISCUSSION

In reaching the foregoing findings of fact and the conclusions of law which follow, we have had the benefit of detailed and extended briefs submitted by counsel. Because of the need for an immediate decision, we shall not prolong this already extended opinion by seeking to discuss, apply or distinguish the many cases cited by respective counsel.

## I.

### *Jurisdiction*

■ Shortly after the filing of plaintiff's complaint, defendant moved to dismiss the complaint for lack of subject-matter jurisdiction on the grounds that: (1) plaintiff's localized activities have no substantial impact on interstate commerce and (2) plaintiff failed to utilize the adjudicatory procedures of the Office of Oil and Gas of the Department of the Interior established under a federal regulation for the fair and equitable allocation of gasoline supplies in the United States. Although defendant's characterization of its second ground appears on its face to be an exhaustion of administrative remedies argument, defendant is, in fact, arguing that the primary jurisdiction over this action rests with the Office of Oil and Gas. Because plaintiff alleges that defendant's activities had a substantial adverse effect on interstate commerce, and thereby

presenting a question of fact, Donlan v. Carvel, 209 F.Supp. 829, 831 (D.Md. 1962), we took defendant's motion to dismiss under advisement pending the taking of testimony on plaintiff's application for preliminary injunctive relief. At oral argument on plaintiff's motion for a preliminary injunction, defendant represented to the Court that it does not press its motion to dismiss based on lack of subject-matter jurisdiction at this time and that it now seeks to stay rather than dismiss these proceedings pending the submission of plaintiff's claim for a fair and reasonable gasoline allocation to the primary jurisdiction of the Office of Oil and Gas. Nonetheless, we must undertake, *sua sponte*, to examine the subject-matter jurisdiction of this Court prior to ruling on an application for preliminary injunctive relief.

## A.

### *Interstate Commerce*

■ Under the prevailing standards utilized to determine jurisdiction under the Sherman Act, the Act applies to combinations or conspiracies in restraint of trade, where (1) the activities complained of involve transactions within the flow of interstate commerce or (2) the activities complained of are wholly intrastate or local in character, but directly and substantially affect interstate commerce. Las Vegas Merchant Plumbers Ass'n v. United States, 210 F.2d 732 (9th Cir. 1954), cert. denied, 348 U.S. 817, 75 S.Ct. 29, 99 L.Ed. 645 (1954); United States v. Pennsylvania Refuse Removal Ass'n, 242 F.Supp. 794 (E.D. Pa.1965), aff'd. 357 F.2d 806 (3d Cir. 1966), cert. denied, 384 U.S. 961, 86 S. Ct. 1588, 16 L.Ed.2d 674 (1966). Since plaintiff does not allege that defendant's allegedly illegal activities occurred in interstate commerce, plaintiff must show that the application of ARCO's gasoline allocation program to it directly and substantially affects interstate commerce. Burke v. Ford, 389 U.S. 320, 88 S.Ct. 443, 19 L.Ed.2d 554 (1967); Lieberthal v. North Country Lanes, Inc.,

332 F.2d 269 (2d Cir. 1964); Page v. Work, 290 F.2d 323 (9th Cir. 1961), cert. denied, 368 U.S. 875, 82 S.Ct. 121, 7 L.Ed.2d 76 (1961); Evening News Publishing Co. v. Allied Newspaper Carriers, 263 F.2d 715 (3d Cir. 1959).

█ It is undisputed that ARCO is engaged in the production of petroleum products in interstate commerce. Defendant argues that since the gasoline sold to plaintiff and other purchasers in the Philadelphia area is refined in Philadelphia and, thereafter, delivered to plaintiff, its activity affects only a local activity of the plaintiff and, thereby, only incidentally and insubstantially affects interstate commerce, relying principally on Myers v. Shell Oil Co., 96 F. Supp. 670 (S.D.Cal.1951).

In Burkhead v. Phillips Petroleum Co., 308 F.Supp. 120 (N.D.Cal.1970), the Court declined to follow *Myers* in the light of the expanded view of what constitutes activities within the scope of interstate commerce. See Burke v. Ford, 389 U.S. 320, 321, 88 S.Ct. 443, 19 L. Ed.2d 554 (1967); Moore v. Mead's Fine Bread, 348 U.S. 115, 75 S.Ct. 148, 99 L.Ed. 145 (1954). In *Burkhead* plaintiff, a lessee-dealer of Phillips Petroleum, filed a complaint alleging antitrust violations under the Sherman and Clayton Acts. In denying defendant's motion to dismiss for lack of jurisdiction, the Court held:

"The acts complained of in the case before us occurred in the course of interstate commerce or affected same to the extent that the products to be purchased by the plaintiff allegedly came from out of state (or were 'perfected' out of state, thus avoiding the holding of *Myers* in any event). Even if the products involved—gasoline, tires, batteries, Blue Chip stamps—were manufactured and delivered wholly intrastate in California, they certainly 'affected' interstate commerce to a substantial degree. Thus the complaint is sufficient in this regard." [citations omitted]. 308 F.Supp. at 124.

Since its commencement of operations in October of 1972 until the implementation of ARCO's control program in June of this year, the 80th and Ogontz location was delivered over 2,000,000 gallons of gasoline. The curtailment of deliveries of this significant volume of gasoline may be sufficient to warrant a conclusion that such curtailment substantially affects interstate commerce under the *Burkhead* rationale. Moreover, plaintiff's location is situated in close proximity to New Jersey and does a substantial amount of trade in tires, which are manufactured and delivered through interstate commerce. Thus, we must initially and preliminarily conclude that the curtailment of plaintiff's gasoline supplies by ARCO substantially affects interstate commerce and, accordingly, defendant's motion to dismiss for lack of jurisdiction must be denied at this time without prejudice to its renewal following discovery and the submission of further memoranda.

### B.

### *The primary jurisdiction of the Office of Oil and Gas*

In the light of Laveson v. Trans World Airlines, 471 F.2d 76 (3d Cir. 1972), defendant has moved to stay, rather than to dismiss, this action, pending the submission of plaintiff's claim for a fair and reasonable allocation of gasoline to the primary jurisdiction of the Office of Oil and Gas of the Department of the Interior. On May 10, 1973, Secretary Simon of the Office of Oil and Gas announced a voluntary allocation program for gasoline supplies which was later published in the Federal Register on May 23, 1973, 38 Federal Register No. 99. This program, established under the provisions of the Economic Stabilization Act of 1970, created a priority of categories of those entitled to gasoline supplies and established administrative procedures for customers of suppliers of petroleum products to obtain necessary supplies and to hear com-

plaints of those who believe they are not receiving a proper allocation under the guidelines of the program. The intent of the program is to assure adequate supplies for essential needs and provide an equitable basis for assuring that independent members of all segments of the industry obtain sufficient supplies to meet their customers' needs. ARCO argues that since the relief sought by plaintiff in this action—a fair and reasonable allocation of gasoline—can be obtained from the Office of Oil and Gas by means of a mandatory allocation on the supplier, this Court should yield to the primary jurisdiction of that administrative agency.

Plaintiff's principal claim arises under the anti-trust laws and this Court is confronted with the recurring problem arising when conduct seemingly within the reach of the anti-trust laws is also at least arguably protected or prohibited by another regulatory statute enacted by Congress. See Ricci v. Chicago Mercantile Exchange, 409 U.S. 289, 93 S.Ct. 573, 34 L.Ed.2d 525 (1973). While we are here concerned with a regulation promulgated pursuant to a regulatory statute rather than a regulatory statute itself, the Act conferred upon the Office of Oil and Gas no express exemptions from the anti-trust laws. Absent an unequivocally declared purpose to do so, the courts will be hesitant to hold that a new regulatory scheme is designed to completely displace the anti-trust laws. Pan American Airways v. United States, 371 U.S. 296, 304–305, 83 S.Ct. 476 (1963). Moreover, repeals of the anti-trust laws by implication from a regulatory statute are strongly disfavored and have been found only in cases of plain repugnancy between the anti-trust and regulatory provisions. Otter Tail Power Co. v. United States, 410 U.S. 366, 93 S.Ct. 1022, 35 L.Ed.2d 359 (1973). In the instant case, we decline to conclude that the program in question supplants the anti-trust laws in the absence of an express intent to do so and because of the very nature of the program itself.

The express language of the program itself provides that it is but a voluntary and temporary stop-gap measure established in response to the purported energy crisis. While the program seeks to establish on a voluntary basis a priority of needs, the program is presently a transitory measure whereby hearings still continue to determine whether any changes should be made in the program or whether the program should be made mandatory. Plaintiff's operation at 80th and Ogontz does not fall within those classifications entitled to a priority under the program and the provision for allocation to new customers emphasizes the voluntary nature of the program. Under that provision: "[a]ll suppliers are urged to continue to supply customers that they have added since the base period * * * ". Under the administrative procedures of the Act, the Office may, but is not required to, provide a public hearing prior to the imposition of a mandatory allocation. Plaintiff's allegation of substantial anti-trust violations would not necessarily guarantee a hearing on such claim and, thus, the remedy offered by the instant program is conceivably illusory. Although we recognize that the agency's expertise and superiority in gathering relevant facts and in marshalling them into a meaningful pattern would be of considerable assistance to the Court, we must conclude that the presently voluntary and transitory nature of the program, pending a preliminary determination by the Office of Oil and Gas, does not mandate a stay of this action. Accordingly, defendant's motion to stay this action will be denied without prejudice to its renewal in the event new agency guidelines are established or a mandatory allocation program imposed.

## II.

### Preliminary Injunction

To warrant the issuance of a preliminary injunction, the burden rests with the plaintiff to establish: (1) a reasonable likelihood of success on the

merits; (2) irreparable harm to the plaintiff, absent such an injunction; (3) absence of harm to the defendant; and (4) absence of harm to the public interest. Winkleman v. New York Stock Exchange, 445 F.2d 786, 789 (3d Cir. 1971). *See also* Penn Galvanizing Co. v. Lukens Steel Co., 468 F.2d 1021 (3d Cir. 1972); A. L. K. Corp. v. Columbia Pictures Industries, Inc., 440 F.2d 761 (3d Cir. 1971). While we are making no conclusive determination on the merits of this case, we preliminarily conclude that plaintiff has failed to meet its burden of showing the two most important requisites for the issuance of a preliminary injunction: a likelihood of success on the merits and irreparable harm. In so concluding, we will limit our discussion to these two elements.

## A.

### *Likelihood of success on the merits*

In its complaint, plaintiff alleges as its principal claim a violation of Section 1 of the Sherman Act in that defendant entered into a combination and/or conspiracy with one or more of its lessee-dealers or its subsidiary stations (1) to eliminate or suppress the competition of the price-cutting independent or contract dealers and/or (2) to raise, regulate, or stabilize prices of retail gasoline in Philadelphia and its adjoining suburban area, thereby restraining trade. In addition, plaintiff alleges as pendent claims, that the application of ARCO's gasoline allocation program to plaintiff constitutes a material breach of the Contract Dealer Agreement between the parties, a material breach of an oral requirements contract between the parties, which defendant is now estopped to deny, and a discriminatory allocation of gasoline, in violation of § 2–615 of the Uniform Commercial Code, 12A P.S. § 2–615(b). The logical starting point of our discussion is the contract itself.

### 1. *Breach of Contract*

There is no material factual dispute between Intermar and ARCO, concerning the contracts for the sale of petroleum motor fuel products to Intermar at its various locations. Moreover, plaintiff does not allege that the "Contract Dealer Agreement" itself between ARCO and Intermar constitutes a contract in restraint of trade in violation of Section 1 of the Sherman Act.

Under the Contract Dealer Agreement between ARCO and Intermar for its 80th and Ogontz location, the duration of the contract was for the term, September 1, 1972, to August 31, 1977 or until 6,000,000 gallons of motor fuel were delivered, whichever occurs last. [Paragraph 3] The agreement further provides that Intermar would purchase not less than 840,000 gallons annually and that Intermar would not be required to purchase and ARCO would not be required to deliver more than ⅛ of the annual gallonage in one calendar month. [Paragraph 4]. Paragraph 4, additionally, states the minimal gallonage which Intermar shall be required to order and accept and ARCO shall deliver on Intermar's order as "not less than one-twentieth of such annual gallonage in each calendar month". The agreement also provides that the "terms, manner and quantities of deliveries shall be in accordance with Atlantic's current practice in effect from time to time". [Paragraph 4]. Under the force majeure provision of the contract, it was provided that "neither party shall be in default if unable to fulfill an obligation under [the] Agreement by reason of * * * compliance with any government order, requisition or request * * *". [Paragraph 9]. Finally, the agreement provides that "it constitutes the entire understanding of the parties and may not be changed except by a written agreement executed by both parties". [Paragraph 12].

Plaintifff charges the defendant with a material breach of this agreement entered into by the parties on June 30, 1972, by failing to adhere to the *then* current practice of furnishing all dealers

98

with their entire marketing needs of gasoline, thereby breaching the provision that the "terms, manner and quantities of deliveries shall be in accordance with Atlantic's current practice *from time to time*." The provision does not, however, provide "in accordance with Atlantic's current practice *at the time of the contract*". Rather, the contract intended and contemplated changes in conditions requiring possible change in "current practice"; hence, the use of the phrase "from time to time" to allow for future *change* in "current practice", as and when required. Since ARCO's current practice changed in response to the alleged energy crisis, on this record we cannot conclude that plaintiff's efforts to prove breach of contract in defendant's failure to currently follow supply practices in effect on the date of the contract or thereafter, is endowed with a reasonable likelihood of success.

 Plaintiff also contends that when the contract was executed it was intended by the parties to be a "requirements contract" thus imposing upon the defendant the obligation and duty to at all times supply to plaintiff its entire marketing needs of gasoline, as it in fact did until faced with a purported fuel shortage and governmental intervention. While plaintiff suggests "fair and reasonable" allocations, it here suggests that *it* should substantially receive its *entire* needs at the expense of increased shortages to those dealers not enjoying "requirements contracts". The answer lies not in any inconsistencies in the plaintiff's contention, but rather in the express terms of the agreement providing that ARCO shall not be required to deliver on buyer's order more than one-twentieth of such annual gallonage (840,000) in each calendar month. Thus, in the face of such express language, we cannot, on the present record, accept the plaintiff's unilateral understanding that it had a "requirements contract". Moreover, this conclusion is supported by the parol evidence rule which is injected into this case by the contractual clause, providing that the agreement "constitutes the entire under-

standing of the parties and may not be changed except by a written agreement executed by both parties." Under the Uniform Commercial Code, the written contractual terms may not be contradicted by evidence of any prior agreement or of a contemporaneous oral agreement. 12A P.S. § 2–202. Only where the Court finds that the writing is not intended to have constituted the entire agreement of the parties may evidence of consistent additional terms be admitted. In the instant case, the writing, by its express terms, constitutes the entire agreement of the parties, thus plaintiff is precluded from introducing not only consistent additional terms to explain or supplement the agreement, but also prior contradictory terms as plaintiff has sought to do here. Moreover, under Pennsylvania contract law, to obviate the effect of the parol evidence rule, plaintiff must aver that false representations were made and that such fraudulent representations were fraudulently or by accident or mistake omitted from the subsequent complete written contract. Nicolella v. Palmer, 432 Pa. 502, 507, 248 A.2d 20 (1968). Because the agreement appears to be a final expression of the agreement between the parties and because plaintiff has failed to prove requisite allegations of fraud, we decline to accept under the parol evidence rule, parole testimony of a purported prior or contemporaneous understanding that this was to be a requirements contract.

 Similarly, as will be discussed *infra*, the weight of the credible testimony on this record indicates that ARCO's gasoline allocation program was developed pursuant to a government request from the Office of Oil and Gas of the Department of the Interior. Under paragraph 9 of the agreement, ARCO is not in default if unable to fulfill an obligation under the agreement because of compliance with any government order, requisition or request. Thus, even assuming *arguendo* that the contract was breached, performance by ARCO would be excused under paragraph 9 of the agreement. Accordingly, on the record

before us, we are unable to conclude that plaintiff has shown a likelihood of success on its claim for breach of contract.

## 2. *Promissory Estoppel*

The doctrine of promissory estoppel, as set forth in Section 90 of the Restatement of Law, Contracts, holds that: (1) a promise (2) which the promisor should reasonably expect to induce (3) action or forbearance of a definite and substantial character (4) on the part of the promisee (5) and which does induce such action or forbearance, is binding (6) if injustice can be avoided only by enforcement of the promise. North Penn Oil & Tire Co. v. Phillips Petroleum Co., 358 F.Supp. 908 (E.D.Pa. 1973); In re Flying W. Airways, Inc., 341 F.Supp. 26 (E.D.Pa.1972). For the reasons stated in our discussion of the applicability of the parol evidence rule to plaintiff's breach of contract claim, supra, we likewise conclude that there is no reasonable probability that Intermar will succeed in proving there was a "promise". As stated by Judge Broderick in North Penn Oil & Tire Co., *supra*, "a disappointed expectation does not give rise to an estoppel."

## 3. *The Uniform Commercial Code*

Intermar further contends that the application of ARCO's gasoline allocation program to it is in violation of § 2–615 of the Uniform Commercial Code, 12A P.S. § 2–615. Where availability of adequate supply is a "contingency the non-occurrence of which was a basic assumption on which the contract was made" and part of the seller's capacity to perform is affected, § 2–615 requires the seller to make a fair and reasonable allocation of such supply among his customers. Section 2–615 is intended to excuse partial performance by a seller of a supply contract when full performance becomes impossible. But, here, there has been full compliance with the contract and in addition the contract specifically provides for the very contingency here involved. To hold that Section 2–615 prohibits an express provision excusing performance in the event of a specified contingency would change the meaning of that section. *See* North Penn Oil & Tire Co. v. Phillips Petroleum Co., *supra*. Additionally, it has not been demonstrated that the provisions of the Code, providing for fair and reasonable allocation, have been violated. The fact that plaintiff, under the allocation formula, receives less than its marketing needs is the result of its lack of sales history in 1972 rather than the result of any arbitrary and discriminatory conduct by the defendant designed to damage the plaintiff because he is a discounting contract dealer as opposed to a lessee-dealer. There is not one iota of evidence in this record proving that any dealer of whatever description, lacking a comparable 1972 sales history and lacking a "material intervening event", has received an allocation based upon a formula other than that applied to the plaintiff. True, there may be other formulae which would produce a greater allocation for the plaintiff and those in like status, which would appear to the plaintiff to be more equitable, but that possibility does not establish a conspiracy, combination, breach of contract or violation of the Uniform Commercial Code. Accordingly, at this time, we conclude that plaintiff has not shown a likelihood of success on its claim under Section 2–615 of the Uniform Commercial Code.

## 4. *The Sherman Act*

In its claim under Section 1 of the Sherman Act, 15 U.S.C. § 1, plaintiff alleges that ARCO and its Philadelphia and suburban area lessee-dealers and/or its Philadelphia and suburban area subsidiary dealers entered into a combination or conspiracy to (1) suppress or eliminate the competition of ARCO's large volume price discounting independent or contract dealers in the Philadelphia and suburban marketing areas and (2) raise, regulate or stabilize the prices charged the public by its retail dealers. It is well established that elimination, by joint collaborative action, of discounters from access to the market constitutes a *per se* violation of the Act,

United States v. General Motors Corp., 384 U.S. 127, 86 S.Ct. 1321, 16 L.Ed.2d 415 (1966), as does price fixing. United States v. Arnold, Schwinn & Co., 388 U.S. 365, 87 S.Ct. 1856, 18 L.Ed.2d 1249 (1967); United States v. Parke, Davis & Co., 362 U.S. 29, 80 S.Ct. 503, 4 L.Ed. 2d 505 (1960). Additionally, it is not necessary to show that the challenged activities suppress all competition. Paramount Famous Lasky Corp. v. United States, 282 U.S. 30, 44, 51 S.Ct. 42, 75 L.Ed. 145 (1930). The issue before the Court in this case is whether plaintiff has on the record before us shown the requisite concerted action; i. e., here a combination or conspiracy between ARCO and its lessee and/or subsidiary dealers, which constitutes an essential element of a Section 1 cause of action.

■■■ Although plaintiff has produced no direct evidence that a combination or conspiracy existed or occurred, it is established that it is not necessary to show an explicit agreement as an essential part of a Sherman Act combination or conspiracy. United States v. General Motors Corp., 384 U.S. 127, 142–143, 86 S.Ct. 1321, 16 L.Ed.2d 415 (1966); Theater Enterprises v. Paramount Distrib. Corp., 346 U.S. 537, 74 S.Ct. 257, 98 L.Ed. 273 (1954). Because it is rarely possible to demonstrate an agreement by direct evidence, it is permissible for the courts to infer a conspiracy from circumstantial evidence demonstrating joint and collaborative action which is pervasive in the initiation, execution and fulfillment of the alleged illegal plan. United States v. General Motors Corp., *supra*, 384 U.S. at 142–143, 86 S.Ct. 1321, 16 L.Ed.2d 415. The underlying theory of Intermar's combination-conspiracy theory is that the price-cutting competition of the independent discounters caused the lessee-dealers surrounding the discounters to complain about the prices charged to ARCO, who, in turn, pressured the discounting contract dealers to raise their prices. Failing in this tactic, plaintiff argues, ARCO began, pursuant to the combination or conspiracy with the Philadelphia area lessee-dealers, to curtail supplies to the dis-

counters. The record demonstrates that complaints were made to ARCO representatives concerning the price of gasoline, although the complaints were directed toward the prices charged by all competitors in the surrounding areas. Additionally, the record indicates that ARCO discussed pricing policy with representatives of the various discounters. (ARCO's discussion with DeLaTour of Bobcat, Inc., however, appears to be primarily concerned with securing prompt payment for gasoline deliveries.) If viewed in a vacuum, the dealer complaints and ARCO's alleged reaction thereto could conceivably support an inference that ARCO had entered into a combination or conspiracy with its lessee-dealers in the Philadelphia and suburban areas to restrain trade in violation of Section 1 of the Sherman Act. See Interphoto Corp. v. Minolta Corp., 295 F.Supp. 711 (S.D.N.Y.1969), aff'd, 417 F.2d 621 (2d Cir. 1969). Upon a view of the totality of the circumstances and upon consideration of the weight of credible evidence on the record presently before the Court, we conclude that the more compelling inference is that ARCO's gasoline allocation program was developed virtually on a nationwide scale, encompassing the entire marketing area east of the Rockies, unrelated to the specific marketing situation existing in Philadelphia and its adjoining suburbs.

The uncontradicted testimony of the witnesses produced by Intermar emphatically demonstrates that ARCO's gasoline allocation program was established on a marketing area basis, embracing the entire area east of the Rocky Mountains. The allocation program was developed pursuant to a governmental request issued by Secretary Simon of the Office of Oil and Gas of the United States Department of the Interior in order to accommodate the available supplies of gasoline during the summer of 1973, thereby preserving the basic minimum inventory necessary to keep ARCO's supply system operational through September, 1973, with refineries operating at full capacity. This evidence estab-

lishes that ARCO's allocation program was virtually nationwide in scope and unrelated to the activities of Intermar and other discount dealers in the Philadelphia area. To suggest that the defendant's allocation formula for the entire area east of the Rockies was based upon a combination or conspiracy involving a few dealers in the Philadelphia area is to suggest that Philadelphia controls the defendant's marketing policies east of the Rockies, for which there is no supporting evidence in the record. These considerations negate the suggestion of a combination or conspiracy.

Under ARCO's gasoline allocation program the same control basis was used for lessee-dealers, for contract dealers and for commercial dealers and the testimony adduced at the preliminary hearing demonstrates that the allocation program was applied without discrimination among these classes of dealers. Where there was a corresponding sales history for June 1972, the dealer received 104% of its June 1972 sales. Absent a corresponding sales history for June 1972, or the occurrence of a material intervening event, the dealer was allocated 104% of $\frac{1}{12}$ of the estimated yearly consumption (EYC) for that location in calculating its allocation control figure for contract and lessee-dealers in June 1972. Material intervening events include, inter alia, a change in dealers, reconstruction of a location, highway reconstruction, change in traffic patterns, the occurrence of a natural disaster such as Hurricane Agnes, and like matters. Since Intermar had no sales history with ARCO in June 1972 for its contract operations at 80th and Ogontz, at Castor and VanKirk, and at Norristown, the allocation in June 1973 was 104% of $\frac{1}{12}$ of the EYC for each station. Under these allocations, only 80th and Ogontz utilized its entire supply, while substantially less than the allocated amount was used at the remaining locations. Moreover, under the June 1973 allocations in the Philadelphia and suburban area, approximately 68 stations exhausted their supply, of which approximately one-half were lessee-dealers. Thus, on this record, there is no evidence that ARCO acted discriminatorily or unfairly toward Intermar and other contract dealers in establishing its gasoline allocation.

Finally, plaintiff's allegation that the allocation program was arbitrarily and discriminatorily administered against independents by ARCO representatives on a local level, in that they refused to consider exceptions on the basis of hardship is unsupported by the evidence. Accordingly, we conclude on the substantial, but incomplete, record before us that plaintiff has failed to demonstrate a likelihood of a combination or conspiracy within the meaning of the Sherman Act.

### B.

### *Irreparable Harm*

In support of its claim for injunctive relief, plaintiff alleges that it will suffer irreparable harm in the event such relief is not granted in that as a result of the curtailment of supplies of gasoline, it has suffered a direct loss of profits over and above its normal return on capital and has suffered direct loss of its prospect for additional profit in the future. The gasoline allocation at 80th and Ogontz has caused a decrease in sales volume, a curtailment of hours of operations and a decrease in the number of its employees. Intermar's president, Anthony Baker, testified that the reduction of its gasoline supplies at the 80th and Ogontz location would cause a very minimal profit to be produced. Paragraph 42 of the complaint calculates the total actual damage suffered by the plaintiff to exceed one million dollars, subject to trebling under the Sherman Act. In addition, plaintiff claims that as a result of the curtailment of its gasoline supplies, its 80th and Ogontz location has suffered a direct loss of its good will and reputation as a 24-hour station and as a price discounter. The import of plaintiff's allegations and proofs with respect to irreparable harm clearly demonstrate that Intermar's loss resulting from the curtailment of supplies due to ARCO's gasoline allocation

program are calculable in money damages. It has been uniformly held in this circuit, that where plaintiff's losses are calculable in monetary damages, preliminary injunctive relief must be denied. A. L. K. Corp. v. Columbia Pictures Indus. Inc., 440 F.2d 761 (3d Cir. 1971); Graham v. Triangle Publications, Inc., 344 F.2d 775 (3d Cir. 1965).

Moreover, the plaintiff corporation operates fourteen retail gasoline service stations in Philadelphia and its surrounding area, of which its 80th and Ogontz location is but one. Further evidence of plaintiff's ability to absorb the monetary loss caused by the allocation program pending an ultimate determination of this case on its merits, is that plaintiff's remaining ARCO "contract dealers" stations at Castor and VanKirk and at Norristown have been allocated 52,000 gallons each and that such allocations have not been nearly consumed. Although ARCO has represented to this Court that it would have no objection to the transfer of gasoline from those locations to 80th and Ogontz, Intermar has made no effort to take advantage of additional available gasoline resources.

Thus, on the record before the Court, there is no evidence that Intermar has suffered or will suffer irreparable harm from the application of ARCO's gasoline allocation program pending an ultimate determination of this case on its merits. Accordingly, plaintiff's motion for preliminary injunctive relief will be denied.

Before reaching our conclusions of law, we hasten to observe that we do not here decide the merits of the case. They are not before us for determination and indeed could not be determined on the substantial, but incomplete, record before us. Nothing herein stated should be construed as an attempt to determine finally any aspects of the ultimate merits of the case based upon a complete record. Railroad Yardmasters v. Pa. R.R. Co., 224 F.2d 226 (3d Cir. 1955); Hamilton Watch Co. v. Benrus Watch Co., 206 F.2d 738 (2d Cir. 1953); United States v. Atlantic Richfield Co., 297 F.Supp. 1061, 1067 (S.D.N.Y.1969);

Unicon Mgmt. Corp. v. Koppers Co., 366 F.2d 199 (2d Cir. 1966).

Parenthetically, we add that we are not unaware of allegations of anti-competitive behavior among the major petroleum-producing companies; of allegations that a fuel crisis does not, in fact, exist; of allegations that said crisis has been intentionally created by the major petroleum-producing companies for ulterior purposes; and similar allegations of lesser import. Suffice it to say, that these issues are not before us. We decide the issues before us on the basis of the record before us, aware of our obligation to do no more and no less.

## CONCLUSIONS OF LAW

1. Under the evidence, the plaintiff has failed to prove a combination or conspiracy, involving the defendant, to suppress competition in violation of the Sherman Act;

2. Under the evidence, the plaintiff has failed to prove a combination or conspiracy, involving the defendant, to raise, regulate, stabilize or control gasoline prices;

3. Under the evidence, the plaintiff has failed to prove a violation or breach of defendant's contractual agreements;

4. Under the evidence, the plaintiff has failed to prove a violation of the Uniform Commercial Code of Pennsylvania;

5. Plaintiff has failed to prove a reasonable probability of success on the merits;

6. Plaintiff has failed to prove irreparable harm;

7. The public interest will not be harmed by the denial of a preliminary injunction;

8. The acts of the defendant in the manufacture, distribution and sale of gasoline affects interstate commerce;

9. Under the evidence, the defendant has not discriminated against the plaintiff;

10. Under the evidence, the defendant is under no obligation to supply

plaintiff with its entire gasoline requirements and is not estopped from allocating its supplies;

11. The Office of Oil and Gas of the United States Department of the Interior does not have primary jurisdiction of plaintiff's claim for an additional or mandatory allocation of gasoline supplies;

12. A preliminary injunction will be denied.

### ORDER

And now, this 9th day of August, 1973, it is ordered:

1. That plaintiff's motion for a preliminary injunction is denied;

2. That defendant's motion that all proceedings be stayed pending plaintiff's application to the Office of Oil and Gas of the United States Department of the Interior for a gasoline allocation is denied, without prejudice to its renewal in accordance with this opinion;

3. That defendant's motion to dismiss is denied without prejudice to its renewal upon completion of discovery and the submission of supporting memoranda.